John F. Collins (JC 9324)
DEWEY BALLANTINE LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

David A. Ettinger (P26537)
Jeffrey H. Kuras (P66036)
HONIGMAN, MILLER, SCHWARTZ AND COHN, LLP
660 Woodward Avenue
2290 First National Building
Detroit, MI 48226-3506
(313) 465-7368

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
USA BASEBALL, THE NATIONAL HIGH
SCHOOL BASEBALL COACHES ASSOCIATION,
DR. PETER BERG, JUAN HERNANDEZ, DENNIS
CANALE, MEL ZITTER, MICHAEL CRUZ, TITO
NAVARRO, JOHN TORRES, EASTON SPORTS,
INC., WILSON SPORTING GOODS CO.,
RAWLINGS SPORTING GOODS COMPANY, and
HILLERICH & BRADSBY COMPANY, INC.

Plaintiffs,

- against -                                      Civil Action No. 07-CV-3605

CITY OF NEW YORK,

Defendant.

----------------------------------------------------------------X


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION AND
MOTION FOR SUMMARY JUDGMENT**

I.    **INTRODUCTION**

Plaintiffs, including parents, coaches, manufacturers and USA Baseball, the organization

governing amateur baseball in the U.S., seek to enjoin the enforcement of New York City

Administrative Code § 10-165 (the "Bat Ordinance"). The Bat Ordinance outlaws the use of

non-wood bats in high school baseball games. Plaintiffs have moved for summary judgment, or,

in the alternative, a preliminary injunction against enforcement of the Bat Ordinance prior to its

September 1 effective date. The Bat Ordinance seeks to solve a problem that does not exist –

injuries to pitchers caused by baseballs hit with metal and composite bats. Data shows that

players are as likely to be killed by lightning strikes as from a batted baseball, Kirby Decl. at ¶ 8

(Ex. 1), and this risk does not change if metal or composite bats are used instead of wood.

Verhalen Decl. at p. 12 (Ex. 2). The Bat Ordinance deprives players of choice and imposes costs

on them without any logical or factual justification.

The Bat Ordinance is deficient and irrational in many respects. There is absolutely no

evidence that metal and non-wood composite bats are inherently dangerous, or that any concern

about safety (itself unjustified) could not be met by regulation. Indeed, bats are already

regulated by baseball organizations, including the high schools affected by the Bat Ordinance.

Darby Decl. at ¶ 4 (Ex. 3); 10/23/06 Tr. at 23 (NYC0000223) (Ex. 14).

There is certainly no "fair, just and reasonable" connection between the Bat Ordinance

and the need to protect health and safety, as is required under New York law for the City to be

within its statutory and state constitutional "police power" authority. See legal discussion, *infra*.

While the proponents of the ban claim that metal bats have been getting "hotter" and therefore

more dangerous, all the evidence shows that injury rates for batted balls are not only extremely

low, but have been stable or declining over the last 20 years. Verhalen Decl. at pp. 10-11 (Ex.

2), Kirby Decl. at ¶ 5 (Ex. 1). There is simply no scientific or other reliable basis for concluding

2

that current bats create any greater safety risk than do wood bats. Verhalen Decl. at p. 12 (Ex. 2).

The Bat Ordinance's complete prohibition of the kinds of bats freely chosen by the vast majority of baseball players is rife with contradictions and illogic. The Bat Ordinance prohibits all non-wood composite bats, but permits wood composite bats, even though many such bats may contain less than 5% wood veneer, which has no effect on bat performance. Chou Decl. at ¶ 8 (Ex. 5); Chauvin Decl. at ¶ 11 (Ex. 6). The Bat Ordinance prohibits bats with "any part" metal, as if any amount of metal in a bat can somehow make it dangerous. NYC Admin. Code § 10-165(a)(4).

The Bat Ordinance's efforts to regulate wood composite bats are equally unlawful. The Bat Ordinance permits such bats to the extent they are permitted by Major League Baseball, a private organization, for use in the professional minor leagues. *Id.* Thus, it impermissibly delegates responsibility for such regulation to a private body, and accepts whatever wood composite bats that Major League Baseball approves for its own purposes. Major League Baseball's protocol includes the exact exit speed tests that are already used to regulate bats in high school play. Ex. A to Chauvin Decl. at ¶ 2; Chauvin Decl. at ¶¶ 13-14 (Ex. 6). Thus, the Bat Ordinance adopts a batted ball exit speed regulation that, if sufficient today in high schools, would mean that the Ordinance is completely unnecessary. Alternatively, if this exit speed regulation were improper, then the Major League Baseball standard is inappropriately contained in the Bat Ordinance. There is simply no rational basis for the scheme in the Ordinance.

The Bat Ordinance should be enjoined before it takes effect, because it will cause substantial harm to players, teams and manufacturers:

3

1.    Players and schools will be forced to use bats that they do not like, and that will be far more costly, because of the frequency with which wood bats break and must be replaced.  Torres Decl. at ¶¶ 5, 6 (Ex. 7); Cruz Decl. at ¶ 6 (Ex. 8); Berg Decl. at ¶ 5 (Ex. 9).

2.    Many New York high school players who participate in other amateur leagues, which are not governed by the Bat Ordinance, will need to purchase two sets of bats, wood or wood composite bats in high school games, and the more popular and competitive metal and non-wood composite bats in other games. [1]  This will further increase their expense, or (if they cannot afford these bats) decrease their participation in baseball. Navarro Decl. at ¶ 4 (Ex. 10); Seiler Decl. at ¶ 6 (Ex. 11); Canale Decl. at ¶¶ 16, 17 (Ex. 12).

3.    Interstate commerce will be significantly burdened, because New York City high school teams playing interstate games outside of the state will need to purchase non-wood bats to be competitive in these games, and out of state teams playing in New York City high school games will be forced to purchase wood and wood composite bats.  Canale Decl. at ¶¶ 11, 12, 14, 15 (Ex. 12).  This extra expense will likely result in a reduction of the many interstate games now played, resulting in fewer opportunities for players to obtain broader experience and exposure.  Canale Decl. at ¶ 13 (Ex. 12).

---

[1] Non-wood bats are more competitive and popular, not because they result in greater exit speed for the best hits, but because they permit more good hits (at exit speeds achieved as well with

4.      Bat manufacturers will lose significant sales, and their reputations will be substantially harmed, as the perception is created that their metal and non-wood composite bats must be unsafe.  Arndt Decl. at ¶¶ 6-8 (Ex. 13).

It is no surprise that both the Public School Athletic League and the Catholic High School Athletic Association, representing the vast majority of high schools in New York, oppose the Bat Ordinance.  10/23/06 Tr. at 21-25 (NYC0000221-25) (Ex. 14); 3/12/07 Tr. at 8-11 (NYC0003505-09) (Ex. 15).  Mayor Bloomberg did as well, stating in his veto message:

> Baseball is one of the safest of all major sports played at the high school level. The risk of injury resulting from batted balls is extraordinarily small.  In the City, there's no record of any serious injury resulting from a batted ball.
>
> ***
>
> In sum, Introductory Number 341-A's ban on metal baseball bats in City high school baseball games is unsupported by any empirical data, and risks placing city high school baseball players at a competitive disadvantage.

Bloomberg Veto Message (NYC0001600-01) (Ex. 16).  The Bat Ordinance hurts baseball, and hurts New York high school players.  It violates New York and federal law in many respects.  It should be declared unlawful, and enjoined.

## II.    FACTS

### A.      Background

The baseball bats used by high school baseball teams throughout the country may be made of wood, composite materials or metal.  See Chauvin Decl. at ¶ 7 (Ex. 6).  However, in the early 1970s, when metal bats were introduced, they became the overwhelmingly popular choice among high school baseball teams.  Zitter Decl. at ¶ 10 (Ex. 17); 9/27/02 Tr. at 5 (NYC0000952) (Ex. 20).  More recently, many bats are "composites," composed of epoxy, graphite and

---

wood bats), since they have a larger sweet spot and permit the player to have better contact if the ball is not hit perfectly.  Seiler Decl. at ¶ 9; Canale Decl. at ¶ 8.

fiberglass. Chauvin Decl. at ¶ 11 (Ex. 6). A small minority of composite bats are "wood composites." Chauvin Decl. at ¶ 11 (Ex. 6). In some cases, manufacturers make composite bats and then cover them with wood veneer for cosmetic purposes. Chou Decl. at ¶ 8 (Ex. 5); Chauvin Decl. at ¶ 11 (Ex. 6).

The bat manufacturer plaintiffs and the other firms manufacturing metal and non-wood composite bats have lighter, durable and more effective bats, which are easier for baseball players to swing, and make the game more exciting and competitive. Torres Decl. at ¶ 5 (Ex. 7); Zitter Decl. at ¶ 11 (Ex. 17); Berg Decl. at ¶ 4 (Ex. 9); Chou Decl. at ¶ 9 (Ex. 5).

Bats of particular materials are not uniform in their characteristics or performance. For example, metal bats vary with respect to the thickness of the walls of the bat and the materials used in the bat. Chauvin Decl. at ¶¶ 5-6 (Ex. 6). Non-wood composite bats vary in their materials and the manner in which the materials are placed together on the bat. Chauvin Decl. at ¶¶ 6, 8, 9 (Ex. 6). Wood bats also vary widely in quality, depending on the particular wood used. Chauvin Decl. at ¶ 12 (Ex. 6). Bats can be made of northern white ash, maple or other materials. *Id.* These differences in materials and structure affect the performance, including the exit speed, of each kind of bat. Chauvin Decl. at ¶ 9 (Ex. 6).

### B.     <u>There Is No Safety Problem</u>

The overwhelming – and unrebutted – scientific evidence shows that there is no greater risk of injuries from non-wood bats than from wood bats, and that the risk of injury from batted ball injury generally is not only minute, but far less than the levels of injuries in many other sports which are unregulated by the City of New York or other governmental bodies. Verhalen Decl. at pp. 12-13 (Ex. 2); Greenwald Decl. at ¶ 3 (Ex. 22).

First, the evidence shows that baseball is one of the safest sports, far safer than both such "collision" sports as football and hockey. See Verhalen Decl. at p. 8, Chart 4 (Ex. 2). Indeed,

football has nearly four times the rate of catastrophic injuries as baseball, and hockey has nearly six times the catastrophic injury rate of baseball. *Id.*

Second, batted ball injuries represent a very small percentage (less than 10%) of total injuries in baseball itself. See Verhalen Decl. at p. 8 (Ex. 2).

Third, since non-wood bats have been used for the vast majority of amateur play since the mid 1970s, significant data does not exist comparing injury rates with wood and non-wood bats. Verhalen Decl. at pp. 8-10 (Ex. 2). However, data does exist directly testing the assertions of the proponents of the Bat Ordinance – that the non-wood bats which have been used almost universally for 30 years have recently become more dangerous because they involve more sophisticated designs and materials. 10/23/06 Tr. at 17-18 (NYC0000218) (Ex. 14). If that were true, of course, there would be an increased rate of injury from metal bats. In fact, that injury rate has either declined or been steady since at least the early 1990s. See Verhalen Decl. at pp. 11-12 (Ex. 2); Kirby Decl. at ¶ 5 (Ex. 1).

Fourth, the absolute rate of serious injuries to pitchers from batted balls is itself minute, literally on the order of one in a million participants. 10/23/06 Tr. at 137 (NYC0000339) (Ex. 14).

Fifth, the potential issue of bat safety has already been addressed through efforts to reduce non-wood bat performance in order to reduce offense. The National Collegiate Athletic Association ("NCAA") and National Federation of High School Associations ("NFHS") have adopted regulations that restrict batted ball exit speed, bat weight and bat diameter. Chauvin Decl. at ¶ 3 (Ex. 6). These apply to all bats used in high school baseball in the United States including New York. Chauvin Decl. at ¶ 3 (Ex. 6); 10/23/06 Tr. at 59 (NYC0000223) (Ex. 14).

Sixth, the data on "reaction time" shows that a prepared pitcher can easily react to batted balls hit at any exit speeds identified even for pre-regulation non-wood bats. Breen Decl. at p. 15 (Ex. 4). Of course, any pitcher can in a particular rare case be unprepared, make a mistake, and be subject to injury, whether the bat is wood or non-wood. But the amount of extra time available to the pitcher, even assuming that the differences in exit speed between pre-regulation non-wood bats and wood bats still exist today, is simply too small – 2.6% of a second – to give the pitcher any meaningful additional time to react. It is therefore, far too small to affect safety. Breen Decl. at pp. 14-15 (Ex. 4).

Seventh, in any event, if stricter control over bats were desired, there are many ways to regulate bats that do not require the outright banning of all non-wood bats. This can include, for example, tighter restrictions on variables such as exit speed and the configuration of the bat. Regulations have already been adopted, not only by the NCAA and NFHS, but by a number of other amateur baseball organizations, including Little League and many softball organizations. Darby Decl. at ¶ 4 (Ex. 3); Davini Decl. at ¶ 7 (Ex. 19); Greenwald Decl. at ¶¶ 6-8 (Ex. 22).

These regulations have had a significant impact on the performance of the regulated baseball bats. For example, after the NCAA regulations were adopted, college batting averages dropped by 10 points, home runs per game by 0.25 and runs per game by 0.68. Darby Decl. at ¶¶ 6, 7 (Ex. 3).

### C.    Adoption Of The Bat Ordinance

On March 14, 2007, the New York City Council voted to adopt a bill entitled Int. 341-A, which was later adopted as the Bat Ordinance. The Bat Ordinance was vetoed by Mayor Bloomberg, but the vetoed was overridden by the City Council on April 23, 2007. The Bat Ordinance takes effect on September 1, 2007. Int. 341-A § 3.

8

The Bat Ordinance bans the use of bats containing "in whole or in part" metal, as well as non-wood composite bats, in any high school game played in New York City. NYC Admin. Code § 10-165(a)(4). The Ordinance permits the use of wood bats and wood composite bats or wood laminated bats if they are approved by Major League Baseball pursuant to its "Official Rules . . . for Major League or Minor League Baseball play. . . ." *Id.*

## III.    ARGUMENT

Plaintiffs are entitled to a preliminary injunction because there is both a "likelihood of success on the merits and the likelihood of irreparable injury if an injunction is not granted." *Vincenty v. Bloomberg*, 476 F.3d 74, 83 (2d Cir. 2007). For the same reason that Plaintiffs are likely to succeed on the merits, summary judgment is appropriate at this time, as the material facts are undisputed. See attached Statement of Undisputed Facts in Support of Motion for Summary Judgment.

### A.    Plaintiffs Are Likely To Succeed On The Merits

The Bat Ordinance suffers from numerous infirmities, any one of which is sufficient to invalidate it. The claims under each count are described below.

#### 1.    The Ordinance Impermissibly Prohibits Nonwood Bats

The first critical legal flaw in the Bat Ordinance is that it completely prohibits all metal bats and all non-wood composite bats, as well as all bats that are even "in part" metal. NYC Admin. Code § 10-165(a)(4). This broad and draconian approach was taken rather than applying the obvious regulatory solution – controlling the exit speed of batted balls of the bats. In fact, the undisputed evidence is that bats are frequently regulated, and that such regulation is effective in controlling bat performance. Bat exit speed is already regulated by the NCAA, NFHS (governing New York City high school games), Little League and numerous softball organizations. Darby Decl. at ¶ 4 (Ex. 3). These regulations have caused manufacturers to

change the way they make bats, Chauvin Decl. at ¶ 5 (Ex. 6), and have changed the way the

game is played.  Darby Decl. at ¶ 5 (Ex. 3).  Since changes in the characteristics of non-wood

bats can cause changes in exit speed, Chauvin Decl. at ¶¶ 5-10 (Ex. 6); Chou Decl. at ¶¶ 5-8,

further regulation would be practical if desired.[2]

There is certainly not a shred of evidence that bats containing metal or composite bats not

including wood as an ingredient are inherently dangerous.[3]  Greenwald Decl. at ¶¶ 4-5 (Ex. 22).

Current metal and non-wood composite bats in the marketplace already vary in their design and

performance, including the exit speeds which they generate.  Chauvin Decl. at ¶ 9 (Ex. 6).

Indeed, the Bat Ordinance's approval of composite bats containing very small amounts of wood

veneer while prohibiting composite bats without this cosmetic wood covering, Chou Decl. at ¶ 8

(Ex. 5); Chauvin at ¶ 11 (Ex. 6), illustrates the utter absurdity of the prohibition.

Indeed, the provisions of the Bat Ordinance itself preclude any argument that regulation

is impractical here.  That is because, as noted, *supra*, the Bat Ordinance imposes regulation on

wood composite bats, through its (unlawful) delegation of such regulation to Major League

Baseball.  If wood composite bats can be regulated to avoid allegedly excessive exit speed, so

can non-wood composite bats, and metal bats.  Certainly, placing wood veneer over a composite

---

[2] The flaws in the Bat Ordinance do not depend in any way on a conclusion as to whether *current* bat regulations are sufficient, though Plaintiffs believe they are.  The undisputed evidence shows that there are no safety problems from non-wood bats, whatever one thinks about the specific regulations that have been adopted by the various baseball leagues to date. The facts are also undisputed that bats can be regulated and their performance restricted, whatever one thinks about the specifics of current regulations.

[3] *Sanchez v. Hillerich & Bradsby Co.,* 104 Cal. App. 4th 703, 716, 128 Cal. Rptr. 2d 529 (2002), cited by Defendant's counsel at the initial scheduling hearing, does not change this conclusion in any way.  In *Sanchez,* summary judgment was overturned regarding causation of injury from a *particular* metal bat (which predated the current high school regulations).  At most, this case stands for the proposition that there was a rational basis for regulating that particular bat.  It certainly does not support prohibition of all metal and non-wood composite bats.

bat cannot possibly make it more susceptible to regulation than it would be without the wood covering.

For these reasons, an outright prohibition of non-wood bats is simply beyond the statutory or constitutional authority of New York City. While the City of New York has the power to "regulate . . . business" in order to "care for safety and health . . . of the inhabitants of the city," General City Law, Article 2-A, § 20(13), "[t]he power of regulation is not inclusive of the power of prohibition." *Koston v. Town of Newburgh*, 45 Misc. 2d 382, 384, 356 N.Y.S.2d 837 (1965) (quoting *Good Humor Corp. v. New York*, 264 A.D. 620, 624, *aff'd* 290 NW 312). "Prohibition is not the equivalent of regulation." *S. E. Nichols Herkimer Corp. v. Herkimer*, 34 A.D.2d 371, 372-73, 312 N.Y.S.2d 22 (1970) (holding an ordinance invalid "by reason of" the "prohibitory nature [of] the ordinance"). See also *People v. Federico*, 96 Misc. 2d 60, 61; 409 N.Y.S.2d 177 (1978):

> [A] sharp distinction is made between those which ban activities completely and those which merely impose certain limitations on activities . . . in order to sustain a complete prohibition, there must be a showing that the abuses associated with the act prohibited are general and difficult to control by regulation and they cause or threaten an injury to the public which is so serious that the municipality might reasonably believe it outweighs the harm that would be caused to some by complete prohibition.

[Citations omitted].

The analysis in a number of theses cases is quite relevant here. In *People v. Bunis*, 9 N.Y. 2d 1, 172 N.E.2d 273, 210 N.Y.S. 2d 505 (1961), the New York Court of Appeals struck an ordinance prohibiting the sale of periodicals "from which the cover or title page has been removed . . ." *Id.* at 3. While the purpose of the statute was to prohibit "illicit traffic in magazines 'returned' for credit," *id.* at 3, the Court of Appeals found that "it is unreasonable and beyond the legitimate exercise of the police power for the Legislature to interdict all sales, permissible and illicit alike, in order to prevent those which are illicit." *Id.* at 4.

In *Koston*, *supra*, the court ruled that the Town of Newburgh could not prohibit new trailer parks anywhere in the town, even though they had the power to reasonably regulate such housing. In *Federico*, *supra*, the court ruled that a ban on landing excursion boats in the village was an impermissible "complete prohibition." *Id.* at 61.[4]

The case law also makes clear that partial bans or bans for only particular use are subject to the same degree of scrutiny as total prohibitions. In *S.E. Nichols Herkimer*, *supra*, the court found that an ordinance that banned retail activity for two days of the year, Memorial Day and Independence Day, between the hours of 9:00 a.m. and 6:00 p.m., was an invalid prohibition, and not just a regulation, despite the fact that retail activities for other hours were not affected by the ordinance. In *Peace v. McAdoo*, 110 A.D. 13, 14, 96 N.Y.S. 1039 (1905), the court also found that the power to regulate did not include the power to prohibit vehicles "in *parts* of certain streets." (emphasis added). Even though the ordinance permitted vehicles on many other streets, the partial ban constituted an impermissible prohibition. *Id.* at 14.

The same conclusion applies here. There is absolutely no basis for the conclusion that regulation of bats would be impractical. Nor is there any basis to believe that metal and non-wood composite bats are inherently dangerous. In fact, they are "legitimate" products, preferred by consumers. For these reasons, the outright prohibition of all metal and non-wood composite bats is utterly irrational and unlawful, and the Bat Ordinance should be invalidated.

## 2.    The Bat Ordinance Exceeds the City's Authority

Even if the Bat Ordinance merely regulated bats, it would still be unlawful, because there is no evidence of a safety problem that justifies any action by the City of New York. New York

---

[4] *See also North Hemstead v. Exxon Corporation*, 53 N.Y. 2d 747, 757; 421 N.E. 2d 834; 439 N.Y.S. 2d 342 (1981) (concurring opinion by Fuchsberg, J.) (cited cases striking ordinances involving "a regulation which functions as a prohibition [or] a prohibition which is so excessive that it interdicts otherwise legitimate activity . . .").

law grants cities, such as New York City, general police powers to "preserve and care for the safety, health, comfort, and general welfare." General City Law, Article 2-4, § 20(13). While this delegation is broad, New York law requires that "[i]n order for an exercise of the police power to be valid, there must be 'some fair, just and reasonable connection between it and the promotion of the health, comfort, safety and welfare of society." *People v. Bunis*, 9 N.Y.2d 1, 4, 172 N.E.2d 273, 210 N.Y.S.2d 505 (1961).

Under this standard, New York courts have held that speculative and unfounded perceptions of health risks cannot form the basis of a ban on a product when there is a total lack of scientific evidence of the product's danger. *Cellular Tel. Co. v. Village of Tarrytown*, 209 A.D.2d 57, 67, 624 N.Y.S.2d 170 (1995) (holding invalid an ordinance that prevented the construction of cellular towers where there was no scientific evidence that cellular antennas caused a health risk, despite numerous statements from the community about fears of health risks). Moreover, a mere "dearth of studies" of an alleged health risk is insufficient to justify legislation. 209 A.D.2d at 68. As the *Cellular Telephone* court held in striking the legislation, there is no merit to the contention that, "the perception of health risks" need not "be reasonable or scientifically based in order to justify the adoption." 209 A.D.2d at 67.

Other New York courts have invalidated local laws that, while professing to be in the interest of safety, did nothing to achieve that end. For example, in *Trio Distributor Corp. v. Albany*, 2 N.Y.2d 690, 695, 143 N.E.2d 329, 163 N.Y.S.2d 585 (1957), the New York Court of Appeals overturned an ordinance aimed at protecting the safety of children crossing the street and at improving sanitary conditions on ice cream delivery trucks. The Court of Appeals

13

concluded that the method chosen to achieve this objective, requiring that trucks employ additional personnel, was "too attenuated a connection . . . to sustain its validity." *Id.*[5]

Here, as described above, there is simply no reliable evidence to support the claim that non-wood bats pose a safety risk. For this reason, as well, the Bat Ordinance is beyond the authority of the City of New York and cannot be sustained.

### 3.    The Ordinance Impermissibly Delegates Legislative Power To A Private Body

The Bat Ordinance is also unlawful because it conditions the use of wood composite bats on their approval by Major League Baseball. NYC Admin. Code § 10-165(a)(4). This is both irrational and improper. Pursuant to this provision, the New York City Council has delegated lawmaking functions for the health and safety of its citizens to a private body, Major League Baseball. It has irrationally done so, since Major League Baseball approves wood composite bats for minor league professional play, not high school play. This goal creates inconsistencies with the professed safety concerns of the New York City Council. For example, the Major League Baseball protocol requires that wood composite bats break if hit on the handle. Ex. A. to Chauvin Decl. (Ex. 6). Yet a broken bat can increase danger for high school players as well as increase costs because of the need to frequently replace broken bats. Cruz Decl. at ¶¶ 4, 6 (Ex. 8).

Moreover, the Bat Ordinance does not adopt (or specify) the *current* Major League Baseball standards, but permits any wood composite bat "approved by major league baseball, pursuant to such organization's official rules . . ." If Major League Baseball modified its official rules tomorrow, in any way whatsoever, those changed rules would govern the use of wood

---

[5] Some of the cases addressing challenges to ordinances under New York state law have melded together the police power and due process analyses. See discussion, *infra*, in Section 6.

composite bats in New York City high schools. Thus, the law in New York City would change without any action of the Mayor or City Council.

This delegation to Major League Baseball also demonstrates the arbitrary and contradictory rationale for the Bat Ordinance. The tests under the Major League Baseball protocol include the very same exit speed tests applied by the NCAA and NFHS to regulate metal and non-wood composite bats at the high school and college levels. 3/12/07 Tr. at 54 (NYC0003568) (Ex. 15); Chauvin Decl. at ¶¶ 13-14 (Ex. 6); Ex. A to Chauvin Decl. (Ex. 6). If these tests are adequate (as the scientific evidence supports), then there is no need for the Bat Ordinance, since they are already being applied. If they are not adequate, then the New York City Council has no rational basis for its adoption of the Major League Baseball protocol using these same tests to regulate wood composite bats.

Both federal and state due process requirements forbid the delegation of lawmaking to private parties. The New York Court of Appeals has stated that the delegation of legislative power to "a private corporation, is such an abdication as to be patently an unconstitutional relinquishment of legislative power in violation of Section 1 of Article III of the Constitution of this State." *Fink v. Cole*, 302 N.Y. 216, 225, 97 N.E.2d 873 (1951). "An abdication of legislative power to a private party is unconstitutional." *Builders' Council of Suburban New York, Inc. v. City of Yonkers,* 106 Misc. 2d 700, 702, 434 N.Y.S.2d 566 (1979).[6] Similarly, the federal Constitution does not permit "a legislative body . . . to [constitutionally delegate] to private parties the power to determine" property rights. *General Elec. Co. v. New York State*

_____

[6] See also *Atlantic-Inland, Inc. v. Union*, 126 Misc. 2d 509, 515, 483 N.Y.S.2d 612 (1984) ("The principle has long been established that a municipality has no more power than the State to delegate to others the right to exercise its police power.")

*Dep't of Labor*, 936 F.2d 1448, 1455 (2d Cir. 1991). This renders the Bat Ordinance unconstitutional and unlawful.

### 4.    Impermissible Burden On Interstate Commerce

The Bat Ordinance is also unconstitutional because it will significantly interfere with interstate baseball. The Bat Ordinance only applies to high school play in New York City, NYC Admin. Code § 10-165(b), but New York City high school baseball teams play many games every year against teams outside of the State of New York. Canale Decl. at ¶¶ 12-14 (Ex. 12). [7] When these games are played outside of New York City, teams from New York City will either have to purchase a second set of bats (so they can play competitively with non-wood bats), or suffer the disadvantage of less effective wooden bats. Canale Decl. at ¶ 11 (Ex. 12). Conversely, teams from outside New York State would have to purchase a set of wood bats in order to play games in New York City against New York City high school teams. *Id.* at ¶ 12 (Ex. 12). This extra expense will likely cause many of these games to be canceled. *Id.* (Ex. 12) This will reduce the exposure of New York City high school players to teams, coaches and scouts outside of New York. *Id.* at ¶ 13 (Ex. 12). New York City high school baseball will become isolated. *Id.* (Ex. 12).

The burden here arises from the fact that the Bat Ordinance "may adversely affect interstate commerce by subjecting activities to inconsistent regulations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88 (1987); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 50 (2d Cir. 2007) (same). Inconsistent regulation can burden interstate commerce by imposing greater costs on persons needing to undertake the expense of complying with two sets of rules.

---

[7] This activity involves the "transportation of persons across state lines that has long been recognized as a form of 'commerce'." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 573 (1997) (holding that children's summer camp constituted commerce protected by the Commerce Clause).

For example, in *Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 671 (1981), the Supreme Court found that the law was invalid because, *inter alia*, "Iowa's law is now out of step with the laws of all other Midwestern and Western states."

Courts invalidate legislation under the Commerce Clause when "on balance, detriments to interstate commerce clearly outweigh the benefits to legitimate local public interests." *Association of Int'l Auto. Mfrs., Inc. v. Abrams*, 84 F.3d 602, 612 (2d Cir. 1996). The question is "one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved." *Id.*

As part of the balancing test, the Second Circuit requires an analysis of whether a statute will *in fact* achieve its objective. *Id.* (overturning the district court's grant of summary judgment and remanding because it was debatable whether the New York law at issue would actually accomplish its objective of improving safety and reducing insurance rates); *Town of Southhold, supra*, at 53 (remanding Commerce Clause issue for "fact-intensive" balancing test). The mere "incantation of a purpose to promote the public health or safety does not insulate a state law from commerce clause attack." *Kassel, supra,* at 670-671 (finding that the alleged safety benefit of the truck regulation was "illusory"). Thus, since the Bat Ordinance burdens interstate commerce, in order to avoid transgressing the Commerce Clause, it must in fact achieve an appropriate purpose, not merely assert some possible "rational basis" for its concern. *Id.*

This balancing is easily accomplished here, because, as described above, there is no evidence that the Bat Ordinance will accomplish anything in terms of its stated purpose of improving baseball safety. Impairing competition between baseball teams across state lines, and thereby restricting the athletic opportunities of New York City high school athletes, cannot be justified by an ordinance that will accomplish nothing at all, except to raise costs and interfere

17

with choice for high school athletes. The Commerce Clause is therefore violated, and the Bat
Ordinance is unconstitutional.

### 5.    The Ordinance Violates The Equal Protection Clause Of The U.S. and N.Y. Constitutions By Discriminating Without Any Rational Basis

The Bat Ordinance is also unlawful because it is discriminatory and arbitrary. By
banning metal bats and non-wood composite bats, but permitting wood composite bats, the Bat
Ordinance discriminates against manufacturers of metal and non-wood composite bats without
any rational basis.

The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination that
lacks a rational basis. A distinction between two similarly situated parties will not withstand
challenge when legislation does not bear "a rational relation to some legitimate end." *Romer v.
Evans*, 517 U.S. 620, 631 (1996); *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000)
(holding that a village's "irrational and wholly arbitrary" action were sufficient to state a cause
of action for violation of the Fourteenth Amendment). The equal protection standard under New
York law is practically identical. *Countryman v. Schmitt*, 176 Misc. 2d 736, 748, 673 N.Y.S.2d
521 (1998) ("New York's equal protection clause is construed in *pari materia* with its Federal
analogue.")

While invalidation under the rational basis test is rare, it does occur. For example, in *City
of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985), the Supreme Court invalidated
under rational basis review a zoning ordinance that put greater restrictions on group homes for
mentally retarded persons, because, in part, "the city never justifies its apparent view that other
people can live under such crowded conditions when mentally retarded persons cannot." *Id.* at
450. The Supreme Court also found unconvincing the "fear" expressed by local residents of
dangers from mentally retarded persons, when there was no basis for such fears. *Id.* at 459. In

*Countryman, supra,* a New York court found no rational basis to distinguish between private landowners and public landowners in the priority for placement of cell towers, and thus invalidated the ordinance. 176 Misc. 2d at 748. *See also Zobel v. Williams,* 457 U.S. 55 (1982) (invalidating under rational basis review a law that based payments from oil revenues to residents on years of residency in Alaska, because such conditions did not rationally relate to the legislation's objective).

There is no conceivable basis for the Bat Ordinance's distinctions between bats with different materials, and therefore between the manufacturers of those bats. The Bat Ordinance's focus on materials, not exit speed, demonstrate its fundamental illogic, since it is, of course, exit speed that its proponents believe (incorrectly) creates a safety concern. As explained, *supra,* there is nothing inherent in any bat material that makes it dangerous or necessarily results in a greater exit speed. Moreover, the differences between many wood composite and non-wood composite bats are utterly unrelated to the exit speed of the ball. As discussed, *supra,* there is no conceivable reason why wood composite bats can be regulated and non-wood composites or metal bats cannot. There is therefore no conceivable rationale for the distinctions drawn by the Bat Ordinance. Therefore, the Bat Ordinance violates even the "rational basis" test under the Equal Protection clause.

### 6.    The Bat Ordinance is Irrational And Violates The Due Process Clause

For all these reasons, the Bat Ordinance is utterly irrational and also violates the Due Process Clause of the federal Constitution, which requires a rational relationship between an ordinance's objective and the means used to achieve the objective. "[O]ur cases have not departed from the requirement that the government's chosen means must rationally further some legitimate state purpose." *Moore v. East Cleveland,* 431 U.S. 494, 498, n.6 (1977). Courts will invalidate under rational basis review "a mere arbitrary or irrational exercise of power having no

substantial relation to the public health, the public morals, the public safety or the public welfare

. . ." *Players, Inc. v. City of New York*, 371 F. Supp. 2d 522, 547 (S.D.N.Y. 2005). In order to

survive a due process challenge, the legislation must "'finding some footing' in the realities of

the subject addressed by the law." *Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997).

When courts find a lack of relationship between the legislation's purpose and the means

used, courts will strike down the legislation as violating due process. *See, e.g., Craigmiles v.

Giles*, 312 F.3d 220, 225 (6th Cir. 2002) (finding no relationship between a law that only allowed

funeral home operators to sell caskets at retail and the public health, safety and consumer

protection); *Santos v. City of Houston*, 852 F. Supp. 601, 608 (S.D. Tex. 1994) (holding that an

anti-jitney law failed because there was no rational reason that jitneys would cause more safety

or traffic flow problems than other forms of transportation currently in use).

The same general standard is articulated in the New York state cases, but it is fair to say

that the courts have been more willing to strike legislation on substantive due process grounds

under New York State law. *See, e.g., Russell v. Town of Pittsburgh*, 94 A.D. 2d 410, 414, 464

N.Y.S. 2d 906 (1983) ("no reasonable relation" between challenged petition of ordinance and

public interest); *People v. Buckley*, 142 Misc. 2d 262; 536 N.Y.S. 2d 948 (1987) (regulation of

beach chairs on safety grounds unconstitutional because of no evidence of injuries or other

factual basis for actions); *Town of North Hemstead, supra* at 757 ("[M]ost of our state courts,

applying their own constitutional provisions on the order of due process and equal protection,

have not hesitated to reassert a right to thereby scrutinize and, where appropriate, invalidate

economic legislation").

For the reasons stated above, the inconsistency and illogic of the Bat Ordinance means

that it fails to meet even the minimal requirements substantive due process. What conceivable

justification is there for the outright prohibition of bats of certain materials?  How can the prohibition be justified when there are existing exit speed tests used to regulate bats, and those same tests are currently used by New York City's delegee, Major League Baseball?  It is simply impossible to even state a logically consistent rationale for the arbitrary and inconsistent provisions in the Bat Ordinance.  Therefore, it must be stricken.

**B.    Irreparable Injury**

If enforced, the Bat Ordinance will cause substantial and irreparable injury to each of the Plaintiffs, and to the public, in a number of ways.

First, it will significantly harm the quality of baseball played in New York high schools, and make the game less enjoyable for the players.  Players prefer metal and non-wood composite bats, because they are more "forgiving" than wood bats.  It is not necessary for a hitter to make perfect contact with a pitch in order to avoid a sting to the hands.  Cruz Decl. at ¶ 5 (Ex. 8); Seiler Decl. at ¶ 9 (Ex. 11); Canale Decl. at ¶ 8 (Ex. 12); Zitter Decl. at ¶¶ 6-7 (Ex. 17).  These characteristics of metal and non-wood composite bats enable less skilled players to have more success as hitters and create more offense.  Torres Decl. at ¶¶ 4-5 (Ex. 7); Navarro Decl. at ¶ 3 (Ex. 10); Seiler Decl. at ¶ 9 (Ex. 11); Canale Decl. at ¶ 8 (Ex. 12).  If metal and non-wood composite bats are banned, the game will be less fun for the large majority of high school players who are not outstanding athletes, and will make the game less competitive.  Zitter Decl. at ¶ 11 (Ex. 17); Cruz Decl. at ¶ 3 (Ex. 8).

Enforcement of the Bat Ordinance will also impose substantial costs on New York City teams and players, since they will be forced to purchase wood bats, which need to be very frequently replaced and therefore, overall, are substantially more expensive than metal bats.  Canale Decl. at ¶ 10 (Ex. 12); Zitter Decl. at ¶ 13 (Ex. 17); Torres Decl. at ¶ 6 (Ex. 7).

The Bat Ordinance will seriously and irreparably injure amateur baseball leagues in New York City and their high school age players. While non-school sponsored amateur leagues, such as the Youth Service League, Babe Ruth and Pony Leagues are not subject to the Bat Ordinance, many of these leagues involve New York City athletes of high school age. Seiler Decl. at ¶ 6 (Ex. 11). As such, New York City high school players active in these leagues will need to use metal or non-wood composite bats in their other amateur games in order to be competitive. Seiler Decl. at ¶ 6 (Ex. 11). *Id.* Many high school players will either buy two sets of bats or give up their participation in the amateur leagues. Canale Decl. at ¶¶ 14, 15 (Ex. 12).

Furthermore, scholarship opportunities and the chance to attend college will be reduced for many, as New York hitters are likely to be less successful with less forgiving bats, and the reduction in play between New York City teams and non-New York City teams will reduce the exposure of the players. Hernandez Decl. at ¶ 5 (Ex. 19); Navarro Decl. at ¶ 6 (Ex. 10); Canale Decl. at ¶¶ 5-6, 13 (Ex. 12). Since colleges use non-wood bats, recruiters will have difficulty evaluating New York City players. Zitter Decl. at ¶ 5 (Ex. 11); Navarro Decl. at ¶ 6 (Ex. 10). Bloomberg Veto (NYC0001600-01) (Ex. 16).

Enforcement of the Bat Ordinance will also significantly injure the bat manufacturer Plaintiffs in several ways. First, they will lose significant sales in the city of New York. Arndt Decl. at ¶ 8 (Ex. 13). Second, enforcement of the Bat Ordinance will significantly harm the reputation and goodwill of the bat manufacturer Plaintiffs and of their metal and non-wood composite bat products, by suggesting incorrectly to the public that these bats are unsafe. Arndt Decl. at ¶¶ 6-7 (Ex. 13). The Ordinance will also harm the goodwill of USA Baseball and its member organizations by suggesting that these leagues do not care about the safety of their players. Seiler Decl. at ¶ 11 (Ex. 11).

These forms of injury are irreparable, and justify injunctive relief.  It is well established that injury to athletic opportunity constitutes irreparable injury.  *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302, fn. 25 (2d Cir. 2004) (affirming the district court's finding that irreparable injury stemmed from the denial of the opportunity to compete for regional and state championships in high school girls' soccer); *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir. 1993) (finding irreparable injury from denial of the opportunity to play collegiate softball), *cert denied* 510 U.S. 1004 (1993). [8]

The Second Circuit considers harm to goodwill irreparable.  *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996) (holding that irreparable injury stems from the potential loss of goodwill); *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444-45 (2d Cir. 1977) (holding that the plaintiffs goodwill was jeopardized which would create "immeasurable harm" sufficient for an injunction).

In contrast, a delay in enforcement of the ordinance until this court fully addresses the merits will harm no one.  Since, as discussed above, there is simply no evidence of any safety risk here, there is no reason to believe that a delay pending a final trial on the merits will cause any injury.  The speculation that there might be some danger from metal and non-wood composite bats certainly does not justify rejection of an injunction.

**C.    No Injunction Bond Is Needed**

While courts often require a bond in case an injunction is improvidently granted, here, New York City will suffer no harm because of a delay in enforcement of the Bat Ordinance, and, thus, no bond is needed.  Additionally, this case serves a public interest, and therefore a bond is

---

[8] Additionally, while the loss of money from the need to purchase more expensive bats would ordinarily not be considered irreparable, the impracticality of individual money damages actions by particular players against New York City means that these injuries, as well, will ultimately not be compensable, and therefore justify an injunction.

23

not required. *Doctors Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (affirming the district court's denial of an injunction bond where "[d]efendants have not shown that they will likely suffer harm absent the posting of a bond"); *Ward v. New York*, 291 F. Supp.2d 188, 211 (W.D.N.Y. 2003).

## IV.   **CONCLUSION**

For the reasons stated above, the Court should enjoin enforcement of the Bat Ordinance, either by a preliminary injunction until a final judgment is entered, or, alternatively, by granting summary judgment prior to the Bat Ordinance taking effect.

Dated: New York, New York
        May 29, 2007

                                HONIGMAN MILLER SCHWARTZ
                                & COHN LLP

                                By:_____
                                    David A. Ettinger (P26537)
                                    A Member of the Firm
                                2290 First National Building
                                660 Woodward Avenue
                                Detroit, Michigan 48226
                                (313) 465-7368


                                DEWEY BALLANTINE LLP


                                    John F. Collins (JC-9324)
                                    A Member of the Firm

                                1301 Avenue of the Americas
                                New York, New York 10019
                                (212) 259-8000

                                Attorneys for Plaintiffs