UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN

☐ ORIGINAL

BAUM RESEARCH AND DEVELOPMENT
CO., INC., et al.

*Volume - 9, 10, 13, 14 - 24, 29, 31 - 44*

            Plaintiffs,

                                            Case No. 98-72946

    v.

                                            Hon. Avern Cohn

HILLERICH & BRADSBY CO., INC., et al.,

                                            FILED

Defendants.

                                            MAR 11 2005

_____/

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

## VOLUME I – APPENDIX OF CITATIONS TO THE RECORD FOR DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW

David L. Nelson (P18821)
SOMMERS, SCHWARTZ, SILVER &
  SCHWARTZ, P.C.
2000 Town Center, Suite 900
Southfield, MI  48075-1100

Salvatore A. Romano
PORTER WRIGHT MORRIS & ARTHUR
1919 Pennsylvania Avenue, N.W.
Suite 500
Washington, D. C.  20006-3434

Jonathan Howe
John M. Peterson
HOWE & HUTTON, LTD.
20 North Wacker Drive, Suite 4200
Chicago, IL  60606-9833

Gregory L. Curtner (P12414)
David R. Grand (P57492)
MILLER, CANFIELD, PADDOCK & STONE,
PLLC
101 N. Main Street, 7th Floor
Ann Arbor, MI  48104

David A. Ettinger (P26537)
HONIGMAN, MILLER, SCHWARTZ AND COHN LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226

Frank Northam
WEBSTER, CHAMBERLAIN & BEAN
1747 Pennsylvania Avenue, Ste 1000
Washington, D.C.  20006

Allen M. Krass, Esq.
GIFFORD, KRASS, GROH, SPRINKLE,
  ANDERSON & CITKOWSKI, P.C.
280 N. Old Woodward, Suite 400
Birmingham, MI 48009

II

NYC0003395

NYC0003396

*William E. Thurston - Cross*
*Thur./12-16-04*  Vol. 9                    165

1    A.    In this letter, I don't believe so.

2    Q.    And from what I can tell from your studies of the Cape

3    Cod League, one of the points was to show that aluminum bats

4    outperformed wood bats; correct?

5    A.    Right.

6    Q.    And that's exactly what Mr. Archer told the committee

7    in 1992; correct?

8    A.    That's correct.

9    Q.    And isn't it true that as early as 1986, H&B provided

10   information to the NCAA regarding aluminum bat performance?

11   A.    They could very well have.

12   Q.    Could you turn to Defense Exhibit 16.1 please.

13         Mr. Thurston, you've seen this letter from H&B to

14   the NCAA in 1986, before haven't you?

15   A.    Yes.

16   Q.    In fact, that's your handwriting on it, isn't it?

17   A.    Correct.

18   Q.    And this letter talks about a number of issues relating

19   to aluminum bats, doesn't it?

20   A.    Correct.

21   Q.    This letter doesn't contain a single bit of

22   misinformation, does it?

23   A.    At this time, no.

24   Q.    And you truly wouldn't expect bat manufacturers to give

25   the NCAA all of their proprietary internal test data,

*98-72946; Baum, et al. v. H&B, et al.*

NYC0003397

*William E. Thurston - Cross*
*Thur./12-16-04*                                    166

1    . because even you knew that manufacturers couldn't be

2    confident that it would stay away from their competitors;

3    isn't that correct?

4    **A.**    I'd agree.

5    **Q.**    Now, Mr. Thurston, you also testified that the NCAA

6    Rules Committee had recommended that the bat manufacturers

7    submit new models.  Remember we talked about that earlier,

8    submit those new models to the committee?  And we talked

9    about how Mr. Baum didn't submit his high performance

10   composite model to the committee?  You recall that

11   testimony?

12   **A.**    I didn't say he didn't, I said I did not receive one.

13   **Q.**    Okay.  But on March the 4th, 1997, didn't you write a

14   memo to Jack MacKay acknowledging that H&B Louisville

15   Slugger had submitted its new models to you before they were

16   offered?

17   **A.**    Jack did.

18   **Q.**    Could you turn to Defense Exhibit 170 please.  Do you

19   recognize this memo from you to Jack MacKay dated March 4,

20   1997?

21   **A.**    Yes.

22   **Q.**    And you see it's about the two new H&B aluminum models

23   that Mr. MacKay had sent to you so that your players at

24   Amherst College could test them out?

25   **A.**    Yes.

*98-72946; Baum, et al. v. H&B, et al.*

NYC0003398

/ 0

NYC0003399

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BAUM RESEARCH AND DEVELOPMENT
CO., INC., ETC., ET AL.,

        Plaintiffs,

    v.

HILLERICH & BRADSBY CO., INC.,
ETC., AT AL.,

        Defendants.
_____/

HONORABLE AVERN COHN

No. 98-72946


JURY TRIAL -   VOLUME 10

Friday, December 17, 2004

-   -   -

Appearances (Continued on next page):

Sommers, Schwartz
2000 Town Center, #900
Southfield, Michigan  48075
(248) 355-0300
  On behalf of Plaintiffs
  David L. Nelson
  Andrew J. Kochanowski
  David J. Szymanski

Honigman Miller
2290 First National Building
Detroit, Michigan  48226
(313) 465-7368
  On behalf of Easton Sports
  David A. Ettinger

-   -   -

To Obtain Certified Transcript, Contact:
Sheri K. Ward, Official Court Reporter
Theodore Levin United States Courthouse
231 West Lafayette Boulevard, Room 219
Detroit, Michigan  48226
(313) 965-4401

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.


12/17/04 Trial Tr. [Thurston]                    Page 1

NYC0003400

*William E. Thurston - Cross*
*Fri./12-17-04/Vol. 10*                      17

1    Q.    Would you look at the third paragraph of this memo,

2    please.  It says.

3              "It is my understanding that any new

4              alloy or technology must be submitted to

5              NCAA prior to use in NCAA play.  All of

6              our Air Attack line was BPF tested by

7              Dr. Brandt and submitted to you for

8              personal testing before being used in

9              NCAA play.  You have received the Brandt

10             test and the bats some time ago."

11             So this letter confirms that Louisville Slugger in

12   this instance complied with the rules committee request to

13   submit new products, doesn't it?

14   A.    That's correct.

15   Q.    Thank you.  That's all I have with that one.

16             Now, Mr. Thurston, I would like to spend a few

17   minutes talking to you about your opinions and actions

18   regarding the safety of aluminum bats.  Now, am I right in

19   recalling that you told the jury last Friday that there

20   wasn't a safety issue with aluminum bats until '96, '97,

21   '98, '99?

22   A.    That's when we really became concerned about safety.

23   There was talk about safety and a little bit of concern

24   before that, but starting in '96 through the present time,

25   yeah, it's been a major issue, that the aluminum bat

NYC0003401

*William E. Thurston - Cross*
*Fri./12-17-04/Vol. 10*                                    21

1    Louisville, Easton, and The Baum Company?

2    A.    Correct.

3    Q.    And in fact isn't it the case that you have always had

4    the ability to buy any bat you want from any manufacturer

5    you choose, including The Baum Company?

6    A.    I buy bats the players want.  We have -- ask the

7    players what they want for a bat, what size, what length,

8    which model, and we buy now about 14 bats a year because

9    they are not durable, they break, and so we have had to buy

10   more bats.

11   Q.    So you would agree that there is not one NCAA rule that

12   prevents any of your players or you from using the Baum bat

13   in official NCAA contests?

14   A.    Is there a rule that prevents it?

15   Q.    Yes.

16   A.    I don't believe so.

17   Q.    And that's been the case, hasn't it, Mr. Thurston,

18   since the Baseball Rules Committee approved the use of the

19   Baum company's bats way back in January of 1992?

20   A.    I believe so.

21   Q.    And that was, as we discussed, when Steve Baum had

22   provided you with Professor Collier's study that

23   demonstrated his high-performance bats exceeded aluminum by

24   10 percent?

25   A.    I never used the high-performance bat.  Never bought

*98-72946; Baum, et al. v. H&B, et al.*

NYC0003402

William E. Thurston - Cross
Fri./12-17-04/Vol. 10                    56

1    this before, but does it appear to you today that these are

2    the notes that Mr. Breidenthal made of Mr. Baum's

3    presentation to the committee?

4    A.    Yes.

5    Q.    Okay.

6    A.    I can't read them because they are so blanked out here.

7    You couldn't read them either.

8              THE COURT:  Just there's no question.

9              THE WITNESS:  Well, how am I supposed to talk

10   about something --

11             THE COURT:  Sir, there is no question pending.

12   You haven't been asked a question.  We go question by

13   question.

14   BY MR. WIERENGA:

15   Q.    I have actually got just one question for you, sir, but

16   I want to make sure we are on the same page of the document.

17   So if you are on Page 3 now where we first see Steve Baum,

18   if you could turn to the next page, Page 4, it appears that

19   the notes of Mr. Baum's comments continue, and if you could

20   turn another page to Page 5, it appears that the

21   first paragraph reflects comments by Steve Baum and then

22   there is a Sub C, Louisville Slugger, and it appears that

23   you began, Mr. Breidenthal began taking notes on the

24   presentation of Louisville Slugger, correct?

25   A.    Correct.

                98-72946; Baum, et al. v. H&B, et al.

NYC0003403

William E. Thurston - Cross
Fri./12-17-04/Vol. 10                    57

1    Q.    I just want to ask you one question about the paragraph

2    at the top of Page 5.

3              MR. WIERENGA:  And could we highlight that, Joe?

4    BY MR. WIERENGA:

5    Q.    I think I can read Mr. Breidenthal's writing.  You tell

6    me if you disagree with what I think it says.

7    Mr. Breidenthal wrote, "Implement for the 1997 season the

8    following rule "No bat may exceed any value over 10 percent

9    of wood given equal length, weight and sweet spot diameter."

10             MR. SZYMANSKI:  Your Honor, I'm sorry, I have to

11   object.  This is complete hearsay.  He says he does not

12   recognize the document.

13             THE COURT:  The question is is that what that

14   says.  He's identified this -- the exhibit is in evidence,

15   Mr. Szymanski.

16             MR. SZYMANSKI:  Thank you, Your Honor.

17             THE COURT:  The objection is overruled.  Repeat

18   your question.

19   BY MR. WIERENGA:

20   Q.    My only question is would you agree, sir, that that's

21   what it says there?

22   A.    Yes.

23   Q.    Thank you.  And so it appears that Mr. Breidenthal at

24   the meeting wrote down that Steve Baum said to the committee

25   that they should adopt in 1997 a rule that no bat may exceed

98-72946; Baum, et al. v. H&B, et al.

NYC0003404

William E. Thurston - Cross
Fri./12-17-04/Vol. 10                58

1   any value over 10 percent of wood given other things being

2   equal?

3   A.   This is 1995, right.

4   Q.   That's right.

5   A.   And we are talking about 1997?

6        THE COURT:  Read the top.  Listen to the question

7   carefully.

8   BY MR. WIERENGA:

9   Q.   It appears that in 1995 Mr. Baum proposed a 1997 rule,

10  a rule to be used in 1997 in which no bat may exceed any

11  value over 10 percent of wood.  That's what the minutes

12  reflect, correct?

13  A.   Okay.

14  Q.   That's all I have on that document, sir.

15       Now, you also testified earlier in your testimony

16  about an occasion on which the NCAA Executive Committee

17  declined to approve funding of $25,000, I believe it was,

18  for bat-related testing, correct?  That was your testimony?

19  A.   Correct.

20  Q.   Isn't it also true, sir, on another occasion, I believe

21  a year later, that the Executive Committee in fact approved

22  $50,000 for bat-related testing?

23  A.   I'm not sure if it was one year later.  It was when

24  Crisco came on about 1997, and they finally approved it,

25  which was appreciated.  I have no problem with what the NCAA

98-72946; Baum, et al. v. H&B, et al.

NYC0003405

William E. Thurston - Cross
Fri./12-17-04/Vol. 10                    59

1    did up to this time.  We are all on the same page.  We are

2    all trying to do the same thing.

3    Q.    Thank you, sir.  I now want to ask just a couple of

4    questions about what happened in 1998 and the 1998 rule

5    making that we have discussed several times now, and to make

6    sure I have the chronology correct, by late July, early

7    August 1998 the Baseball Rules Committee had recommended or

8    was preparing to recommend the three-prong test with the

9    third prong being that bats could not exceed 93 miles per

10   hour when tested on the Baum?

11   A.    In the lab, right.

12   Q.    Now, at the time of that recommendation it's true,

13   isn't it, that there was only Baum Hitting Machine in the

14   world?

15   A.    That's correct.

16   Q.    And that was located at Mr. Baum's location in Traverse

17   City, Michigan?

18   A.    Right.

19   Q.    And if you could turn to PX245 and we have skipped an

20   exhibit in between there.  This is an August 5th, 1998 memo

21   from Bill Rowe, chair of the rules committee, to the

22   Division I, II and III championship bodies, correct?

23   A.    That's right.

24   Q.    And in this document Mr. Rowe is reporting the rules

25   committee's recommendation regarding the three-prong rule to

98-72946; Baum, et al. v. H&B, et al.

NYC0003406

William E. Thurston - Cross
Fri./12-17-04/Vol. 10                 60

1    these championship bodies, correct?

2    A.    That's correct.

3    Q.    If you could look at the second-to-the-last paragraph?

4            MR. WIERENGA:  Joe, could you highlight that,

5    please?

6            THE COURT:  On which page?

7            MR. WIERENGA:  On the first page, excuse me.

8    BY MR. WIERENGA:

9    Q.    That paragraph reads, "To meet the batted ball speed --

10            THE COURT:  Slower and louder.

11            MR. WIERENGA:  Thank you.

12            "To meet the batted ball speeds,

13            manufacturers will be required to submit

14            their bats for certification to an

15            independent testing group to measure the

16            batted ball exit velocity of a moving

17            ball that is hit by a moving bat.  The

18            independent testing group also will

19            conduct compliance tests for the NCAA on

20            each bat model purchased at random."

21    BY MR. WIERENGA:

22    Q.    Now, at the time this document was created there was no

23    independent testing group that had a Baum Hitting Machine,

24    correct?

25    A.    On August 5th, no.

                98-72946; Baum, et al. v. H&B, et al.


                12/17/04 Trial Tr. [Thurston]         Page 60

William E. Thurston - Cross
Fri./12-17-04/Vol. 10                61

1   Q.   That's correct.  And it wasn't until sometime later

2   that an independent test tester received a Baum Hitting

3   Machine, correct.

4   A.   Correct.

5   Q.   If you could turn to the next exhibit, which is PX411,

6   this is an August 12th, 1998 press release announcing that

7   the NCAA Executive Committee had approved the rules

8   committee's recommendation for the three-prong test with the

9   third prong at 93 plus or minus 1 mile per hour, correct?

10  A.   That's correct.

11  Q.   But the Executive Committee delayed the implementation

12  date to August 1999, correct?

13  A.   Yeah --

14  Q.   At this time?

15  A.   From January to August, yes.

16  Q.   That's correct.

17  A.   Okay.

18  Q.   If you could look at the third paragraph on the

19  first page --

20           MR. WIERENGA:  Could you highlight that, Joe?

21  BY MR. WIERENGA:

22  Q.   It reads:

23           "The rules committee had also

24           recommended that the changes become

25           effective January 1999.  However, the

         98-72946; Baum, et al. v. H&B, et al.

NYC0003408

William E. Thurston - Cross
Fri./12-17-04/Vol. 10                    62

1          Executive Committee delayed the date to

2          assure that proper testing would take

3          place and that bats would be available,

4          and that was the reason that the

5          executive committee gave at the time for

6          delaying implementation."

7               Correct?

8    A.   That's correct.

9    Q.   And if you could read the last paragraph on this page,

10   which is a poor copy, and I apologize for that, but I think

11   I can read what it says and tell me if you disagree.   It

12   says, however -- the executive committee is saying:

13          "However, it is also important that we

14          have independent verifiable testing to

15          assure that we have appropriate bats for

16          collegiate competition, and we need more

17          time to do that than January 1999 as an

18          implementation date gives us."

19               Correct?

20   A.   Correct.

21   Q.   That was the reason that the executive gave for

22   delaying the implementation of the three-prong rule?

23   A.   I have no problem with that.

24   Q.   Now, I apologize, I have an exhibit that's not in your

25   book.  It came up just a few minutes ago.

               98-72946; Baum, et al. v. H&B, et al.

NYC0003409

William E. Thurston - Cross
Fri./12-17-04/Vol. 10                      63

1           MR. WIERENGA:  I have copies here, Your Honor.

2    May I approach?

3           THE COURT:  Go ahead.  What exhibit number?

4           MR. WIERENGA:  It's NX65.

5           THE COURT:  Does anybody have it?

6           MR. WIERENGA:  I have got copies for everyone,

7    Your Honor.

8           THE COURT:  All right.  PX?

9           MR. WIERENGA:  No, NX, Your Honor.

10          THE COURT:  How about the jury?  Does the jury

11   have it?

12          MR. WIERENGA:  They do not.  I'm happy to give it

13   to them, if I may approach, Your Honor.

14          THE COURT:  Yeah.

15              Are you done with your distribution?

16          MR. WIERENGA:  Yes, Your Honor.

17          THE COURT:  I will take judicial notice of the

18   fact that everybody in the courtroom has a copy but the

19   judge.

20          MR. WIERENGA:  We don't want that, Your Honor.

21          THE COURT:  Thank you.

22              NX?

23          MR. WIERENGA:  NX65, Your Honor.

24          THE COURT:  Okay.

25


          98-72946; Baum, et al. v. H&B, et al.


          12/17/04 Trial Tr. [Thurston]              Page 63

NYC0003410

*William E. Thurston - Redirect*
*Fri./12-17-04/Vol. 10*                              103

1    played 35 games, you may win 3 or 4.  It would be an unlevel

2    playing field, okay, because the aluminum bats outperform so

3    much.

4              Also, I wanted to point out, and they tried to

5    make it look like I wasn't concerned about pitchers --

6    Q.   Just go ahead.  Why do you use the bats?

7    A.   We use the bat to compete, okay?  And if I did use wood

8    or composite against our opponents, yes, we would be

9    protecting opponent's pitchers.  Their team using aluminum

10   would not be protecting our pitcher, okay?  And I was

11   questioned in a deposition, well, that shows you are not

12   interested in protected the pitcher.  Do you think I'd be

13   here for seven or eight days, do you think I have done all

14   of this work because I am worried about them not protecting

15   players?  The reason I'm here is to testify on what I know

16   about the situation, and it's all based on safety.  I don't

17   care about home runs, and I do care about the reliability of

18   the game and the integrity of the game and stuff, but the

19   main thing, when I receive a phone call from a mother and

20   dad about a pitcher who has been hurt badly, I really feel

21   bad, I didn't get the job done I should have.

22   Q.   You were asked about the Baum bat in competition?  Why

23   not use the Baum bat in competition at Amherst?

24   A.   Well, if the other team is using aluminum, I'm not

25   going to be able to compete, the same thing I just said.

NYC0003411

13

NYC0003412

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BAUM RESEARCH AND DEVELOPMENT
CO., INC., ETC., ET AL.,

         Plaintiffs,

                            HONORABLE AVERN COHN

   v.

                            No. 98-72946

HILLERICH & BRADSBY CO., INC.,
ETC., AT AL.,

         Defendants.
_____/


JURY TRIAL - VOLUME 13

Wednesday, January 5, 2005

-   -   -

Appearances (Continued on next page):

Sommers, Schwartz             Honigman Miller
2000 Town Center, #900       2290 First National Building
Southfield, Michigan  48075  Detroit, Michigan  48226
(248) 355-0300              (313) 465-7368
  On behalf of Plaintiffs      On behalf of Easton Sports
  David L. Nelson           David A. Ettinger
  Andrew J. Kochanowski

-   -   -


To Obtain Certified Transcript, Contact:
Sheri K. Ward, Official Court Reporter
Theodore Levin United States Courthouse
231 West Lafayette Boulevard, Room 219
Detroit, Michigan  48226
(313) 965-4401

Proceedings recorded by mechanical stenography.
Transcript produced by computer-aided transcription.


              **01/05/05 Trial Tr. (Petr)**          **Page 1**

NYC0003413

Todd Petr – Direct
Wed./1-5-05/Vol. 13                    34

1    Q.    Fair enough.  Dr. Sherwood was the sole person used by

2    the NCAA to create the data, the wood bat database on which

3    the formula could be used?

4    A.    That's correct.

5    Q.    And so in doing so he took 10 bats, 10 wooden bats,

6    correct?

7    A.    I believe that's right, yes.

8    Q.    And those 10 wooden bats were all of equal length?

9    A.    Yes.

10   Q.    And they were all of equal weight?

11   A.    Yes.

12   Q.    And he tested them sometime in August or early

13   September of 1999?

14   A.    Yes.

15   Q.    That's correct?

16   A.    That's right, yeah.

17   Q.    And just so that we understand very clearly what

18   Dr. Sherwood got from those 10 bats were results of the bats

19   hitting between 93.84 miles an hour and 96.042 miles an

20   hour?

21   A.    That sounds correct.

22   Q.    That sounds correct.  And the NCAA had that data in its

23   possession in August or September of 1999, right?

24   A.    We got it in early or mid September, yes.

25   Q.    All right.  And you had an opportunity to decide how to

98-72946; Baum, et al. v. H&B, et al.

NYC0003414

Todd Petr – Direct
Wed./1-5-05/Vol. 13                    35

1    treat that data; is that correct?

2    A.    Not me.

3    Q.    The NCAA?

4    A.    We took it to our research panel, talked to them about

5    it.  At that point that was the group we took it to.

6    Q.    Okay.  So you say you took the results of the 10 bats

7    and you turned it over to Dr. Johnson, Dr. Carroll?

8    A.    The whole panel.

9    Q.    The whole panel.  Is it five people?

10   A.    I think it's seven.

11   Q.    Seven.  And you said now, panel, you tell us how to

12   treat this data?  Should we average these results, should we

13   throw out the high-low and maybe take a median, or should we

14   take the highest results?

15   A.    I believe they stated what they wanted in that June

16   report.

17   Q.    I want your testimony, sir.  Is it your testimony that

18   you took that data and you gave it to the seven people and

19   then you waited to have them tell you, those seven people,

20   tell you how to treat that data?  And, again, whether to

21   average it, whether to maybe throw out the lowest and the

22   highest score and take some median or average of what

23   remains or to pick the highest average?

24   A.    Yeah, that was a decision that was made by the panel.

25   I think it was made earlier than that, but it was a decision

          98-72946; Baum, et al. v. H&B, et al.

NYC0003415

Todd Petr - Direct
Wed./1-5-05/Vol. 13                    36

1    made by the panel.

2    Q.    So that's your testimony then, that those seven people

3    made that decision, correct?

4    A.    Yes.

5    Q.    And Dr. Sherwood wouldn't be involved in making that

6    decision, correct?

7    A.    Dr. Sherwood advised the panel on the data, but no, he

8    was not a member of the panel, he could not vote on any

9    decision-making process, or anything like that.

10   Q.    So Dr. Sherwood had no input on whether or not to adopt

11   ultimately a BESR that equated to a 97-mile-an-hour

12   standard; is that your testimony?

13   A.    Dr. Sherwood was advisory, and certainly we were in

14   contact with him and he spoke with members of the panel in

15   conference calls and that sort of thing.  I'm not sure what

16   you are getting at, but he was involved in the process

17   through the whole thing, but he had no vote.  He had no --

18   he did not have the opportunity to make the final decision.

19   Q.    Okay.  So it was the baseball research panel that made

20   the final decision to increase the BESR to .728?

21   A.    Yes.

22   Q.    And as we saw from the, from the data, from the

23   documents yesterday, it appears that that decision was made

24   sometime between September 21 and September 23; is that

25   correct?

                98-72946; Baum, et al. v. H&B, et al.

NYC0003416

Todd Petr - Direct
Wed./1-5-05/Vol. 13                37

1    A.    That's correct.

2    Q.    All right.  Because on September 23 the NCAA Executive

3    Committee voted to have the BESR be .728, equating to

4    97 miles an hour?

5    A.    That's my recollection, yes.

6    Q.    Okay.  So -- let me back up -- there are no documents,

7    are there, documenting any contact between the blue ribbon

8    panel and Dr. Sherwood or the NCAA that would indicate that

9    that decision came from them; is that correct?

10   A.    This was all handled by conference call.  There are no

11   documents.

12   Q.    You would agree that the decision to change the BESR

13   from .721 to .728 resulted in essentially adding another

14   mile to that top speed, that 96.042 top speed, correct?

15   A.    Yeah, that would be the translation of the BESR, would

16   be about 1 mile an hour, yes.

17   Q.    So it's your testimony then that the blue ribbon panel

18   told the NCAA to use that 96-mile-an-hour top speed, and it

19   was the blue ribbon panel that then added an extra mile to

20   it to arrive at that final BESR, correct?

21   A.    Yeah, 96 plus 1.

22   Q.    And all of those decisions were made independent of the

23   settlement of the Easton lawsuit, which happened at about

24   the same time, correct?

25   A.    The panel was not involved in settlement of the

98-72946; Baum, et al. v. H&B, et al.

NYC0003417

Todd Petr - Direct
Wed./1-5-05/Vol. 13                    38

1   lawsuit.

2   Q.   And Dr. Sherwood was not involved in the settlement of

3   the lawsuit; is that correct?

4   A.   Not to my knowledge.

5   Q.   And you were in touch with Dr. Sherwood during this

6   period of time in mid to late September, were you not?

7   A.   Oh, yes.

8   Q.   So it would have been improper -- well, back up.

9        Dr. Sherwood then wouldn't have been involved in

10  any writings or rewritings concerning any protocols that

11  were being discussed during this late period of time,

12  correct?

13       MR. CURTNER:  Your Honor, I object.  We're going

14  into the subject area that I thought the Court said we were

15  not going to cover.

16       THE COURT:  You will have to remind me.  No, no,

17  no.  I haven't said anything about not examining the witness

18  on anything.  If you want a side bar, I will explain that to

19  you.

20       MR. CURTNER:  I understand your ruling,

21  Your Honor, but I --

22       THE COURT:  Go ahead.

23       MR. CURTNER:  I thought we weren't going to cover

24  all of this today.

25       THE COURT:  No.  Would you like a side bar?

         98-72946; Baum, et al. v. H&B, et al.

NYC0003418

14

NYC0003419

1.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BAUM RESEARCH AND DEVELOPMENT
CO., INC., ETC., ET AL.,

                 Plaintiffs,
   HONORABLE AVERN COHN
        v.                            No. 98-72946

HILLERICH & BRADSBY CO., INC.,
ETC., AT AL.,

                 Defendants.
_____/


                JURY TRIAL -  VOLUME 14

             Thursday, January 6, 2005

                  -    -    -

Appearances (Continued on next page):

Sommers, Schwartz                Honigman Miller
2000 Town Center, #900           2290 First National Building
Southfield, Michigan 48075       Detroit, Michigan  48226
(248) 355-0300                   (313) 465-7368
  On behalf of Plaintiffs          On behalf of Easton Sports
  David L. Nelson                  David A. Ettinger
  Patrick B. McCauley
  Andrew J. Kochanowski

                  -    -    -

         To Obtain Certified Transcript, Contact:
         Sheri K. Ward, Official Court Reporter
         Theodore Levin United States Courthouse
         231 West Lafayette Boulevard, Room 219
                Detroit, Michigan  48226
                    (313) 965-4401

     Proceedings recorded by mechanical stenography.
  Transcript produced by computer-aided transcription.

NYC0003420

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                   71

1    shows that it peaked at .306 in 1998 and has declined by

2    2004 to .291, which is pretty much back where it was in 1979

3    and 1980.  Do you see that?

4    A.   Yes, I do.

5    Q.   And this is based on NCAA statistics.  Can you, sir,

6    tell me whether the NCAA and the panel and the people that

7    you deal with are satisfied with where the performance of

8    the game is today?

9    A.   I know that the baseball coaches and the Baseball Rules

10   Committee are very satisfied that the game is what they

11   would call back in line, that is, the offense and defense

12   are much more balanced than they were say in 1998.  The

13   panel is pleased with where the game sits, and they rely

14   heavily for those impressions on the baseball people.

15   Q.   Now I'm going to ask you a research question.  The

16   decline in the batting average from 1998 through the

17   present, can you as a researcher, as a person who deals in

18   science, draw any conclusions as to what caused that?  Did

19   the change in the rule cause the decline in the batting

20   average?

21   A.   It's always difficult to assert causality on a system

22   that's as large as the sport of baseball.  I would say that

23   the circumstantial evidence here points pretty strongly to

24   changes in the bat and probably the ball to a certain

25   extent, that they probably had a significant effect on what

98-72946; Baum, et al. v. H&B, et al.

NYC0003421

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    72

1    we are seeing on the field, and I know that baseball coaches

2    and baseball folks who we deal with believe that that is,

3    that it is the rule changes in the bats that really make

4    that difference.

5    Q.    Let me back up a little bit and start sort of the at

6    the beginning.  Would you describe what the NCAA is and what

7    it does?

8    A.    The NCAA is a membership organization.  We are made up

9    of colleges and universities, right now of over 1,000

10   colleges and universities.  We are the administrator of the

11   college athletics programs for the nation -- or for our

12   membership group.  We are -- as a membership group,

13   decisions are made by representatives from the membership.

14   That's why we have all of these committees out there that

15   you hear about.  All of them are populated by presidents or

16   faculty or athletics administrators or coaches or whoever it

17   may be from the member institutions.

18            So my job as an administrator in the NCAA national

19   office is to work for the membership and to see that their

20   needs are being met, that their issues are being addressed,

21   and we like to say what we do in the office is serve the

22   membership.  That's sort of our mantra.

23            MR. CURTNER:  Can you put up NX85.  It should be

24   the next one in your books.

25

            98-72946; Baum, et al. v. H&B, et al.

NYC0003422

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                73

1    BY MR. CURTNER:

2    Q.   This is a, at least a portion of the NCAA Governance

3    Organizational Chart; is that correct?

4    A.   Yes.

5    Q.   Would you just quickly describe how all of this fits

6    together as it relates to baseball?

7    A.   Well, as you can see, if you start at the bottom, the

8    Baseball Rules Committee sort of is the first cut.  We look

9    at baseball rules.  There is also championships committees

10   that run championships.  That's a separate piece, but we're

11   talking about the rules of baseball.

12              The Baseball Rules Committee really is the

13   group that would get into the detail and make

14   recommendations that might move up this chain.  You see

15   reference here to a Division I baseball committee,

16   Division II, Division III.  We have three distinct divisions

17   within our association, and we talked a little bit about

18   this a couple days ago, but there is three divisions.

19              The Baseball Rules Committee has representation

20   from all three divisions, which is why you see it cut across

21   the whole bottom.  As the recommendation moves through, they

22   are other steps through the bureaucratic process that it

23   goes to.  As far as rules are concerned, sport rules are

24   concerned, the ultimate, if the divisions have a difference

25   of opinion, the ultimate arbiter of those differences is the

                98-72946; Baum, et al. v. H&B, et al.

NYC0003423

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                74

1    Executive Committee, as you can see there at the top, and

2    again, that's a group of university presidents.

3    Q.   So if, as happened here, Division I reaches

4    one conclusion about a baseball rule and II a different, III

5    a different, what happens?

6    A.   That then would go to the Executive Committee, and the

7    Executive Committee then has the responsibility of aligning

8    the three division's sport rules.  It's important to the

9    NCAA that the rules on the field are consistent across all

10   three divisions.  So it goes to the Executive Committee,

11   which has representatives from all three of those divisions,

     and they work through that.

13   Q.   Why is it important that the playing rules be the same

14   for all three divisions?

15   A.   We want to, first of all, ensure that the college game

16   is the college game, and the division is sort of an

17   artificial administrative and financial distinguisher of

18   universities.  Some are philosophical, some are financial.

19            But we want the college game to be the college

20   game in whatever game we are talking about, football,

21   basketball, or baseball.  Kids can leave one school and go

22   to another in another division.  Coaches can leave one

23   school and go to another in another division.  Referees and

24   umpires call games in all three divisions sometimes.

25            So it just, it streamlines the process.  We don't

        98-72946; Baum, et al. v. H&B, et al.

NYC0003424

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    75

1    want somebody having to go from Division III to Division II

2    and try to remember this rule is appropriate for them and

3    not for us. So it's important that we keep it the college

4    game is the college game.

5    Q.   Now, where does the staff fit into this membership

6    structure?

7    A.   The staff, as I said, serves the membership. So there

8    would be staff that assists each of the groups here and the

9    other 200 or so committees that formulate the administrative

10   decision-making process within the association. So staff

11   simply works as administrators for the committees making

12   sure that they have -- that their meetings are scheduled,

13   that they have appropriate materials, that they have the

14   information that they need. That the communication, we

15   would handle communication between committees at a staff

16   level, for instance, to make sure that if a recommendation

17   moves forward it does so in a proper way. So we are just

18   sort of floating around the edges here assisting with the

19   membership so that they can make appropriate rules and

20   policies.

21   Q.   Does the staff set the rules?

22   A.   Not at all.

23   Q.   Do you have the power to make rules for the NCAA

24   members?

25   A.   Would that I could, but no, I do not.

98-72946; Baum, et al. v. H&B, et al.

NYC0003425

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    76

1    Q.   Does the president of the NCAA have that authority?

2    A.   He has no power to make a rule, no.

3    Q.   So who does have the power to make the rules?

4    A.   The membership does.  In a specified way through a

5    specified committee structure the membership has total

6    control on how rules are set and how they are changed.

7    Q.   How often do these various committees and boards of

8    directors meet?

9    A.   Boards of Directors, Executive Committee meet

10   quarterly.  The committees sort of lower down in the

11   structure, it depends on the committee's needs.  Anywhere

12   from once a year to -- some of the committees that would

13   have, like the baseball research panel in 1999, might meet

14   several times in the span of a couple or three months if

15   there is a significant issue that they are trying to work

16   through.

17   Q.   Now, do the people at the staff, are they the higher

18   ups who can overrule committees?

19   A.   Staff cannot overrule a committee, no.

20   Q.   Do you consider yourself to be one of those higher-ups

21   or a power that be?

22   A.   I'm not a power that be, no.

23   Q.   Now, where would a special committee or group like the

24   baseball research panel fit into this governance structure?

25   A.   Those types of groups, we call that group advisory to

        98-72946; Baum, et al. v. H&B, et al.

NYC0003426

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    77

1    other groups.  In the case of the baseball research panel,

2    when it first became formed, as I say, the issue of baseball

3    bat standards rested at that time with the Executive

4    Committee.  So at that time they were sort of advisory to

5    both the Baseball Rules Committee and the Executive

6    Committee.

7            Since that initial decision was made by the

8    Executive Committee about the BESR standard and all of that

9    in '99, the baseball research panel would be serving as an

10   advisory capacity directly to the Baseball Rules Committee.

11   Q.   So if somebody wanted to change a rule relating to

12   baseball bats or the game of baseball in general, how would

13   they do that?  How would they go through that process?

14   A.   They would make a recommendation to the Baseball Rules

15   Committee, and in this process the Baseball Rules Committee

16   then I think, if it was technical in nature, if it required

17   scientific testing or data to be brought to bear, they would

18   ask the research panel to gather and provide some advice or

19   recommendation or whatever it may be, but the ultimate

20   decision on whether to move that forward in the process

21   would be that of the Baseball Rules Committee.

22   Q.   And then where would its recommendation go?  What would

23   become of it if it was a change?

24   A.   If, if the divisional groups approved it and it went on

25   up through the process, it ends up being a rule in the, in

98-72946; Baum, et al. v. H&B, et al.

NYC0003427

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    102

1    couldn't find it.  The .4 didn't seem to exist.  There was

2    .325 a lot of places, some had ranges, but .4 was a

3    struggle.

4              The other thing we learned -- and we had an expert

5    in.  James Ashton-Miller is an expert in human biomechanics

6    and it was his impression as well as Trey Crisco --

7              MR. KOCHANOWSKI:  Your Honor, objection.  At this

8    point I will interrupt.  If the witness is going to testify

9    about his personal knowledge or his research, it's perfectly

10   proper, but he's talking about somebody else's knowledge.

11             THE COURT:  I know.

12             MR. KOCHANOWSKI:  And that's hearsay.

13             THE COURT:  You've got to rephrase the question,

14   and I take it this is not offered for truth but information

15   that was made available to either the panel or the

16   committee, and in that context I suppose we can -- it's

17   admissible, not offered for the truth.

18             MR. CURTNER:  It's part of the legislative

19   process.

20             THE COURT:  As part of the rule making process.

21             MR. KOCHANOWSKI:  Very well, your Honor.

22             THE COURT:  Thank you.  Now, rephrase your

23   question.

24   BY MR. CURTNER:

25   Q.   The question is:  What did you learn, sir, about this

              98-72946; Baum, et al. v. H&B, et al.

NYC0003428

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    103

1    reaction time issue --

2              THE COURT:  No, what were you told.  There's a

3    difference between learning something and being told

4    something.  If you learn something as opposed to -- just

5    rephrase your question.

6    BY MR. CURTNER:

7    Q.   What information came to your --

8              THE COURT:  No, first, where did he get it from,

9    when did he get it, who did he get it from and what did it

10   consist of.

11             MR. CURTNER:  I think that's what he was trying to

     say, your Honor.

13             THE COURT:  Well, I know what he was trying to say

14   but I suggested how you should proceed with it.  You want to

15   get the evidence in?

16             MR. CURTNER:  I do.

17             THE COURT:  Do it my way.

18   BY MR. CURTNER:

19   Q.   What did you learn and from what source did you, you

20   know, who told you this and what sources did you have?

21   A.   There was, as I said, deliberation among members of the

22   panel.  We leaned a lot in this area to Dr. Ashton-Miller

23   who this was really his area of specialty and one the

24   reasons -- one of the main reasons he had been chosen for

25   the panel.  And he came to a similar conclusion, as did Trey

          98-72946; Baum, et al. v. H&B, et al.

NYC0003429

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                 104

1    Crisco and I think perhaps others when looking at this, that

2    the reaction time, the pitch -- the active reacting in --

3    after full motion of pitching and everything that's going on

4    is very, very difficult to come to any number to try to

5    quantify that; that it, the range over pitch to pitch even

6    or pitcher to pitcher was so great that there really -- it

7    really was difficult, if not impossible, to attempt to truly

8    assess that in any scientific way.

9    Q.    And based on that information, did that inform the way

10   the NCAA went about making decisions relating to this issue?

11   A.    Absolutely.  Reaction time we didn't think we could

12   rely on as a basis for any sort of rule making, because the

13   numbers that we'd be basing it on didn't meet the panel's

14   view of what would be scientifically appropriate.

15   Q.    Now, it also says in this paragraph that ball exit

16   velocities from metal bats currently in use have been

17   measured from 103 to 113 miles per hour.  Do you see that?

18   A.    I do see that.

19   Q.    Do you know whether those are good numbers?

20   A.    I don't know whether they're good numbers or not.

21   Q.    What did you -- did you learn more or later information

22   on this subject?

23   A.    Well, I think these numbers were provided to the

24   Baseball Rules Committee by Mr. Baum.  I think that they

25   came from his lab.

          98-72946; Baum, et al. v. H&B, et al.

NYC0003430

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                105

1    Q.    So these are lab numbers as opposed to field numbers?

2    A.    I believe so, yes.

3    Q.    Now, is it good science or bad science to take lab

4    numbers and use them to project things that are taking place

5    in the field?

6    A.    It's very difficult to do.  I don't think you can make

7    a -- you can translate that, because in the lab, what you

8    want to do is set up a condition that can be repeatable and

9    it's standardized so you can compare across equipment;

10   that's what it's there for.  But that doesn't by any stretch

11   mean that the field is limited to, say, a 70-mile an hour

12   pitch speed.  Obviously pitches go faster than that, or a

13   66-mile an hour swing speed.  Mark McGuire and Barry Bonds

14   probably swings a lot faster than that.  So the lab test

15   needs to be looked at as just what it is, a test in a

16   laboratory to control for variation, but it won't translate

17   into reality in the field.

18   Q.    So in the field, would bats hit the same as they do or

19   balls leave a bat the same -- at the same speeds that they

20   do in the lab?

21   A.    No, I don't think -- not normally.

22   Q.    Now, this says that ball exit velocities have been

23   measured at these speeds.  Do you know whether the ball

24   slows down between the time it leaves the bat and the time

25   it gets to the pitcher?

98-72946; Baum, et al. v. H&B, et al.

NYC0003431

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    106

1    A.    My limited understanding of the physics would say yes,

2    it does in fact slow down, that you have air resistance

3    which works against the ball and gravity, and those two

4    things can slow down.  So if it leaves the bat a 100-miles

5    an hour, as it gets further, it's slowing down all the time

6    and eventually falling to the ground.

7    Q.    And if you were going to do a reaction time projection

8    or try to base something on an estimate of reaction time,

9    would you have to take that slowing down because of air

10   resistance into account?

11   A.    You would, to get -- to get to -- if you wanted to get

12   to the real time it takes for a ball to go X number of feet,

13   you wouldn't actually use the speed as it comes off the bat

14   as the speed.  It would have to be the average speed of that

15   ball between whatever -- between point A and point B.

16   That's how you have to calculate that.

17   Q.    And in this August letter, Exhibit 258, did the NCAA

18   take into account the fact that the ball slows down after it

19   leaves the bat?

20   A.    I don't believe so.

21   Q.    Was that an error?

22   A.    I think it was, yes.

23   Q.    And it says in the conclusion of that paragraph:

24   Therefore, there is a window of time during which a

25   collegiate baseball pitcher could be vulnerable to being

98-72946; Baum, et al. v. H&B, et al.

01/06/05 Trial Tr. [Petr]                    Page 106

NYC0003432

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    107

1    struck by a batted ball.  Is that an accurate statement

2    still, sir?

3    A.    I don't think based on the evidence presented here it's

4    accurate, no.

5    Q.    Is there always some risk of a pitcher getting struck?

6    A.    Yes, there is.

7    Q.    No matter what kind of bats you use?

8    A.    Pretty much.

9    Q.    Now, were there some rulings adopted in August of 1998,

10   some rule changes?

11   A.    I believe there were, yes.

12   Q.    Would you look at PX 94, please.  It should be the next

13   one.

14   A.    NX, you mean?

15   Q.    I'm sorry, NX, yes.  This is the three prong bat rule

16   chart.  Can you explain what the three prongs were?

17   A.    Sure.  The first prong of this rule required that bats

18   be made slightly narrower, that the diameter of the bat be

19   narrowed from a maximum of two and three-quarters inches to

20   a maximum of two and five-eighths, so there was an eighth of

21   an inch removed on the maximum diameter a bat could be.  And

22   the length to weight differential, minus 5 to minus 3 means

23   that you couldn't have a bat that was any more than three

24   units longer than the number of ounces that it weighed.

25            And what we mean by that is under a minus 5 rule,

98-72946; Baum, et al. v. H&B, et al.

NYC0003433

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    108

1    a 34-inch bat could weigh as little as 29-ounces, 34 minus

2    the 29 is your minus 5 rule.  Under the new rule -- under

3    the second prong of this rule, a 34-inch bat would have to

4    weigh at least 31-ounces, and that has to do with how fast

5    you can swing.  The lighter the bat, you can swing it

6    faster.  So they wanted to reduce the speed at which the bat

7    could be swung I believe.

8            And then the third prong, which is we -- is to set

9    this exit velocity, what we now refer to as the BESR.

10   Q.   So going back to prong two, from minus 5 to minus 3,

11   that's the difference between the length and the weight of

     the bat; is that right?

13   A.   Exactly, yes.

14   Q.   And so before, the difference could be five units and

15   after that rule, the difference could only be three units;

16   is that right?

17   A.   Yes.

18   Q.   And so that had the effect of making the bat heavier?

19   A.   Yes, for the same length bat.

20   Q.   And so is a heavier bat slower to swing or faster to

21   swing?

22   A.   I assume slower.

23   Q.   Why is that?

24   A.   Sure would be for me.  Because it's heavier.

25   Q.   It just takes longer for a human to get it up to speed?

            98-72946; Baum, et al. v. H&B, et al.

NYC0003434

Todd Petr - Cross
Thurs./1-6-05/Vol. 14              109

1   A.   It takes longer to bring it around, yeah.

2   Q.   Was there discussion within the NCAA about the

3   effective date of these rules or at least the third part of

4   it?

5   A.   Yes.

6   Q.   And what happened in August of 1998 on that?  You might

7   want to look at NX 36, which is the next document.

8   A.   They -- at this meeting, the NCAA -- this is minutes

9   from the NCAA executive committee.  I believe what they did

10  was to set an implementation date for the ball exit speed of

11  August 1, 1999.  They also adopted the first two prongs I

12  believe at this meeting for use in the 1999 season, if I've

13  got the dates right.

14  Q.   It says on Page 2 of the exhibit, which is also Page 2

15  of the minutes:  Review of baseball rules changes.  Do you

16  see that, sir?

17  A.   Yes.

18  Q.   Item two?

19  A.   Yes.

20  Q.   The executive committee addressed a change in the rules

21  concerning baseball bats that had been recommended by the

22  Baseball Rules Committee.  The executive committee became

23  involved because the three divisions championships bodies

24  had not agreed on the same effective date for the rule

25  change?

98-72946; Baum, et al. v. H&B, et al.

NYC0003435

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    124

1    Q.   And it says that they are part of -- from the division

2    of kinesiology at the University of Minnesota, right?

3    A.   Yes.

4    Q.   And in their abstract on the next page, what is an

5    abstract in this kind of a study?

6    A.   An abstract is a very brief summary of what you're

7    about to read or what the study is about and what it may

8    have found.

9    Q.   And it says in that, that it says a review of the

10   research literature on reaction time and movement time

11   limitations, and then it goes on.  Does that mean that this

12   is in itself a study or is this again a review of

13   literature?

14   A.   It looks to be a review of the literature, not a study

15   data.

16   Q.   What's the significance of the difference of between

17   those, from your point of view as a researcher?

18   A.   Well, in a study, you're actually collecting data, your

19   own data, analyzing it and setting up the parameters under

20   which the study is to take place.  In a review of the

21   literature, you're simply looking at what other people have

22   done in trying to assess that.

23   Q.   And they say: A review of the literature on reaction

24   time, coupled with critical assumptions about fielding

25   behavior and environmental cues, indicates that average

            98-72946; Baum, et al. v. H&B, et al.

NYC0003436

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    125

1    college or professional baseball players may be able to

2    begin an accurate response only 125 milliseconds after the

3    ball is contacted and complete the motion of the arm to the

4    ball in at least 200 milliseconds for a total response time

5    of about 325 milliseconds.

6    A.    I see that, yes.

7    Q.    Now, if you were just reading that, would you conclude

8    that the .4 number on reaction time used in some of these

9    NCAA letters was correct or incorrect?

10    A.    Incorrect.

11    Q.    They then say:  More ecologically valid experiments are

12    needed to verify these estimates.  Do you see that?

13    A.    I do.

14    Q.    Do you know whether there have been, since that time up

15    to the present time, ecologically valid experiments on

16    reaction time in baseball?

17    A.    Not that I'm aware of, no.

18    Q.    Did the baseball research panel look into this

19    question?

20    A.    Yes, they did.

21    Q.    And you mentioned James Ashton-Miller as an expert in

22    biomechanics.  Would you tell the jury a little bit about

23    Dr. Ashton-Miller's qualifications?

24    A.    Yes, Dr. Ashton-Miller is a professor, I'm not sure in

25    which department, but at the University of Michigan here, so

            98-72946; Baum, et al. v. H&B, et al.

NYC0003437

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                126

1    he's local, and has been -- is an expert in biomechanics and

2    how the human body operates and things like reaction times

3    and that's why he was on the panel.

4    Q.    Does he make it his life's work to study human reaction

5    time?

6    A.    I guess so.

7    Q.    What was his view as reported to the panel on whether

8    you could use this number of 325 or 400 or some other number

9    as a basis for setting rules for baseball bats?

10   A.    He thought that there was no -- not enough scientific

11   validity in any of these numbers to be able to base rules on

     them.

13   Q.    Let's look a little further into the Minnesota study,

14   the page marked 100656.  Do you see that they're talking

15   about how long it takes a pitch to travel to home plate and

16   125-mile per hour line drive reaches the first baseman or

17   third baseman in about 490 milliseconds and the pitcher in

18   front of the mound at about 300 milliseconds.  Do you see

19   that?

20   A.    I see that.

21   Q.    Do you know whether they took air resistance or gravity

22   into account?

23   A.    I don't know.  It doesn't appear so.

24   Q.    The whole study is of interest but I want to get to the

25   conclusion which is on Page 100660.  They say -- and this is

            98-72946: Baum, et al. v. H&B, et al.

NYC0003438

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                127

1    Page 9 of their report.

2            Thus an accurate response beginning only 100 to

3    125 milliseconds after the ball is contacted may be a

4    reasonable average for college or professional players to

5    protect themself from wicked line drives.  However, fielders

6    must be able to complete the motion of the arm to the ball.

7    This may be longer than the ten inches used in the study by

8    Williams and MacFarlane which took a mean of about 100

9    milliseconds but certainly should not take longer than 200

10   milliseconds.  This then leads to the surprising conclusion

11   that most fielders are likely to be able to get to the ball,

12   if necessary, in less than 400 milliseconds.

13           Here's the 400 number, right?

14   A.   Here it is, yes.

15   Q.   But if you add up what they're talking about, reaction

16   time of 100 to 125, let's take 125 as the high end, right?

17   A.   Yes.

18   Q.   Plus movement time of 100 to 200, let's take 200 as the

19   high end, that should give you the total, right?

20   A.   Yes.

21   Q.   So if you add 200 and 125, what does it come up with?

22   A.   325.

23   Q.   So by their own study is the 400 supported?

24   A.   No.

25   Q.   So is this 400 just a typo?

             98-72946; Baum, et al. v. H&B, et al.

NYC0003439

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    128

1   A.    Well, it might be.  I guess they say less than, but

2   it's also less than 1,000 I guess.

3   Q.    Now, to be fair to them, on the next page they say:

4   Even if two standard deviations are added to the

5   anticipatory RTs and MTs cited above, the total response

6   time still should be well under 400 MS except for pitchers.

7   And then say:  Pitchers are the special case in fielding.

8   And they say, going down:  Constraints on the pitcher may

9   combine to yield significantly slower response times perhaps

10  even longer than 400 milliseconds.  Right?

11  A.    Yes.

12  Q.    Now, I want to ask you about some of the components of

13  that.  What are standard deviations?

14  A.    Standard deviations is a statistically-derived estimate

15  of the variability of the data, the variants around, your

16  average, if you will.

17  Q.    So they say if you add two standard deviations you

18  might get up to 400; is that right?

19  A.    Yes.

20  Q.    In real people's language what does that mean?

21  A.    In real people's language, essentially what it means is

22  that our estimate of whatever -- of reaction time, when we

23  go out two standard deviations from that particular

24  estimate, we're 95 percent confident that the estimate falls

25  within that range that we're looking at.

                98-72946; Baum, et al. v. H&D, et al.

NYC0003440

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                129

1          So if our estimate is 325 and the standard

2   deviation is 25 let's say, we're 95 percent confident at

3   that point that the real reaction time -- the true reaction

4   time would be 375 or less.

5   Q.   So if the average is 325, they're saying you might get

6   up to 400 by adding some standard deviations to it and you

7   would encompass by that point what percentage of the

8   population?

9   A.   By adding -- at least 95 percent.

10  Q.   And then they say the pitcher might even be longer than

11  400, right?

    A.   Yes.

13  Q.   Now, can you draw any conclusions from this in terms of

14  how to set up a rule for baseball bats?

15  A.   There's so many numbers, there's so much variability, I

16  think that's really where the panel came in.

17  Q.   Now, would you look a little further at Crisco to page

18  100717, almost to the end?

19  A.   Yes.

20  Q.   You see, again, he talks about determine reaction time

21  of pitchers?

22  A.   Yes, I see that.

23  Q.   And he says in the second sentence:  Everyone is in

24  agreement that an actual field study contains both too great

25  of a risk and too much inherent variability to yield any

          98-72946; Baum, et al. v. H&B, et al.

NYC0003441

Todd Petr - Cross
Thurs./1-6-05/Vol. 14                    130

1   meaningful results.  Do you see that?

2   A.   I do.

3   Q.   What does too much inherent variability to yield any

4   meaningful results mean to you?

5   A.   Generally, it means you can't control the environment

6   enough to really get a real estimate of whatever -- in this

7   case, of the reaction time, again, I think what James

8   Ashton-Miller was saying.

9   Q.   Would you look at the next page, please, 100718?  He

10  says critique of the above approach.  Do you see that?

11  A.   Yes.

12  Q.   And in the second paragraph under his critique, he

13  says:  I believe the reaction study is an intriguing and

14  important study and that the study should be conducted.   I

15  do not believe, however, that the results of that study will

16  be useful in accomplishing AIM 1.  The reason is this, in

17  order to accomplish AIM 1, a single value for reaction time

18  is needed.  There is no doubt that the measured reaction

19  times will be distributed, i.e., there will be a range of

20  reaction times from slow to fast.  Given this range, how do

21  you choose single value?

22       Do you see that?

23  A.   Yes, I do.

24  Q.   I guess I should read on, what does it mean for the

25  measured reaction times to be distributed?

98-72946; Baum, et al. v. H&B, et al.

01/06/05 Trial Tr. [Petr]                    Page 130

NYC0003442

15

NYC0003443

*Todd Petr - Cross*
*Fri./1-7-05/Vol. 15*                                    146

1    requirement.  Jay Bhatt seconded the motion.  The motion

2    passed 4 to 0.

3              THE COURT:  What exhibit?

4              MS. MOORE:  This is DX204.1.

5              THE COURT:  What page?

6              MS. MOORE:  Page 01419, but the numbers are in the

7    top left hand.

8              THE COURT:  Oh, yeah.

9              MS. MOORE:  They are not in the place where you

10   usually see them.

11             THE COURT:  Okay.

12   BY MS. MOORE:

13   Q.   So that refreshed your recollection that Mr. Baum

14   actually voted against a CG or MOI requirement in a

15   protocol?

16   A.   That seems to be what happened here, yes.  I don't

17   think I was in attendance.

18   Q.   The final questions about the blue ribbon panel.

19   A.   Sure.

20   Q.   While you were liaison to the blue ribbon panel, to

21   your knowledge, did the panel take any actions that would

22   benefit H&B over any other baseball bat manufacturer?

23   A.   No, they didn't.

24   Q.   Are you personally aware of any misrepresentations made

25   by H&B or their personnel in its dealing with the NCAA or

*98-72946; Baum, et. al. v. H&B, et al.*

NYC0003444