1

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE EASTERN DISTRICT OF MICHIGAN
3               SOUTHERN DIVISION
4
5
6  BAUM RESEARCH AND            )
7  DEVELOPMENT CO. INC.,        )
8                               )
9  VS.                          )    CASE NO. 98-72946
10                              )
11 HILLERICH & BRADSBY CO.,     )
12 ET AL.,                      )
13
14
15
16
17           DEPOSITION OF JACK W. MACKAY, JR.
18
19                  NOVEMBER 16, 2001
20
21
22
23
24
25

**14**

1  Q. (By Mr. Bush) You can answer the question;
2  you're supposed to answer the question.
3  A. He came to me and asked would I build a wood
4  baseball bat plant, and he told me he would put up the
5  money if I would build it for him, and I said I would.
6  Q. When did he come to you?
7  A. I believe like April.
8  Q. April of 2001?
9  A. Yes, sir. I made a deal with him sometime in
10 like June, but I think we started talking a couple of
11 months before that.
12 Q. A couple of months before April of 2001 you
13 began talking to him?
14 A. We made a deal I think in April or May, and we
15 were talking for two months before that.
16 Q. How did you meet Mr. Penfold originally?
17 A. Mr. Penfold called me on the phone and asked
18 if he could come see me. I think my son, who
19 teaches --
20 MR. NELSON: Can I have a continuing objection
21 so I don't have to interrupt you?
22 MR. BUSH: Sure. You don't have to raise
23 relevance objections at a deposition.
24 MR. NELSON: I think it is so far afield that
25 it's appropriate to raise it.

**15**

1  A. My son is an instructor of baseball, and he
2  works at a facility there in Dallas, and I think he
3  instructed Mr. Penfold's son or knew Mr. Penfold's son
4  or somehow or another that relationship came, and he
5  found out who I was and got my number from my son, is
6  my understanding of it.
7  Q. (By Mr. Bush) What is the name of
8  Mr. Penfold's son?
9  A. I don't know.
10 Q. Where is your son an instructor in Dallas?
11 A. He's at Dallas Bat. It's a baseball academy.
12 Q. And that's his full-time job?
13 A. Yes, sir.
14 Q. Now, you indicated you're an employee of DBAT
15 Company?
16 A. That's correct.
17 Q. When did you become an employee of DBAT
18 Company?
19 A. June, I think.
20 Q. June of 2001?
21 A. Yes, sir.
22 Q. What other employees does DBAT Company have?
23 A. My wife, and I think four other people.
24 Q. What are their names?
25 A. You have to get those from Mr. Penfold.

**16**

1  Q. Well, if you know their names, give me their
2  names.
3  A. I think this information is confidential and
4  proprietary, and I don't think it has anything to do
5  with the lawsuit, so get it from Mr. Penfold. He's the
6  boss. He has all of it.
7  MR. ETTINGER: Mr. MacKay, under the
8  protective order you can --
9  A. I was with Louisville for nine years, I know
10 about how they do protective orders, I know that
11 anything that's said in this meeting right here will be
12 in Louisville by noon, so I understand that.
13 Get it from Mr. Penfold. I'm not avoiding the
14 question, it's just not for me to say. I don't own the
15 company. Somebody else is the boss. Go deal with him.
16 And he is a lawyer.
17 Q. (By Mr. Bush) Mr. MacKay, you don't have any
18 ownership interest in the company?
19 A. A very small percentage.
20 Q. What percentage do you have?
21 A. I'm not going to tell you. Louisville Slugger
22 treats their stockholder list as confidential in all of
23 our lawsuits, we're going to treat ours the same way,
24 unless Judge Folsom tells me different.
25 Q. When did you obtain your ownership interest in

**17**

1  DBAT Company?
2  A. When we started it in June, I think.
3  Q. Who else has an ownership interest in DBAT?
4  A. I'm not going to speak any further about DBAT
5  unless Judge Folsom says that I should.
6  Q. Who are the directors of DBAT Company?
7  A. I'm not going to answer any further questions
8  about DBAT unless Judge Folsom says I should. It's
9  proprietary. All during the lawsuits with Louisville,
10 they would not give their officers, their stockholders;
11 they treat them as confidential, and they wouldn't give
12 them to us in discovery, so we'll act accordingly.
13 Q. Who are the officers of DBAT Company?
14 A. I'm not going to give you that information,
15 Mr. Bush.
16 Q. What products does DBAT Company produce?
17 A. Maple baseball bats, and other wood baseball
18 bats.
19 Q. What other types of wood baseball bats does it
20 produce?
21 A. That's it.
22 Q. Besides when you said other baseball bats,
23 what are you talking about?
24 A. Ash. And hickory; we're playing with some
25 hickory now. Wood baseball bats.

### Page 74

1  got about what they paid for.
2  Q. Mr. MacKay, is this the resume that we're
3  talking about?
4  A. I really -- does this have a transmittal
5  letter where it was sent up or something? I don't even
6  know how they got it. I really don't. Is there a
7  letter somewhere where I sent it up and said, here's my
8  resume and I swear under oath this is true? Is there a
9  letter where I gave it to them because I don't even
10  know how they got it? I really don't. Really don't,
11  swear to God.
12  Q. Well, the question is: Is that your resume
13  from whenever it was prepared?
14  A. I don't know. There was a resume prepared
15  when I wrote a book on sunflowers, and I think, to the
16  best of my memory is that somebody said update it.
17  This was written during the '80s, and then I think a
18  couple of pages was added, all this technical advisor
19  to Louisville Slugger, baseball bat design, manager of
20  American League Baseball was added there in like '89 or
21  '99, whenever that date is. Then another page was
22  added to the back.
23      This was an old resume, and I think the way it
24  was, was send us up something because I had already
25  invented the BVXL bat. And as I remember, if they got

### Page 75

1  it, somebody asked for it and it was updated. I was
2  already working for them at the $100 a month figure,
3  and they were furnishing free bats for my baseball -- I
4  don't even know how they got it, and I think somebody
5  ought to give me the letter where I sent it up or
6  something and maybe get to a time frame here.
7  Q. Okay. Let's go to the third page of the
8  exhibit. It indicates -- do you see under education
9  and training?
10  A. Do you represent to me that you have a
11  transmittal letter where this was sent up, because I
12  don't know if it's the right copy or where they even
13  got it?
14  Q. Well, Mr. MacKay, you've previously testified
15  that this is your resume and you gave it to Hillerich
16  and Bradsby. Now, are you going to go back on that
17  testimony?
18  A. I asked when did I give it to them.
19  Q. I don't know. You're the deponent,
20  Mr. MacKay; I ask the questions.
21  A. Then I don't know. I don't know whether this
22  is the right resume or not. I have seen this in all
23  these litigations, it has been brought up, and I don't
24  even know how they got it. I don't see where I
25  represented it. Maybe I did.

### Page 76

1  Q. Okay. Well, let's go to the third page of the
2  exhibit. And you'll notice under education and
3  training it says 1991 through -- I'm sorry, 1961
4  through 1963. Can you read the rest of that for me,
5  please.
6  A. Mississippi State University, Starkville,
7  Mississippi; is that the words you're talking about?
8  Q. Yes.
9  A. B.S. Agricultural Engineering, Minor Business
10  and Marketing. I did not get a B.S. in Agricultural
11  Engineering.
12  Q. And did you get a minor in business/marketing?
13  A. Yes, sir, I probably have -- I probably got
14  more hours than you do. I was from one school to the
15  next before I flunked out. I did get a lot of credits.
16  Q. From Mississippi State?
17  A. Yes, sir.
18  Q. And then the next entry, can you read what it
19  says there?
20  A. Delta State University, Cleveland,
21  Mississippi, graduate work. That's incorrect, it was
22  business administration, I think. I think I did take
23  one course and got a graduate number, is where they got
24  that. The number on the course was supposed to be a
25  graduate number.

### Page 77

1  Q. Now, you didn't --
2  A. I didn't get a Master's or whatever you get.
3  Q. Mr. MacKay, in your deposition that was taken
4  in the litigation with Hillerich and Bradsby, you
5  testified that you didn't know of anything that was
6  incorrect on this resume.
7  A. I asked him what he saw about it. I didn't
8  know how they got it. And I asked him, I said, point
9  it out. What is it you want? I didn't even prepare
10  the thing. I don't type. I couldn't have prepared it.
11      And I said, what is it you don't -- he asked
12  me to look through it and I said, yeah, I've done a
13  little of all this stuff; but I think I pointed out
14  that I didn't graduate.
15  Q. Who prepared the resume?
16  A. I don't know. I think some girl in the farm
17  office in Mississippi originally typed it for a lady
18  from Progressive Farmer, is who I really think this
19  thing was -- she came over and did a bio on me for
20  being like the '85, '88, those years there in the
21  sunflower business.
22      I had written a book, and they came over and I
23  wasn't even there.
24  Q. Was she your secretary?
25  A. She was a girl that worked in the office. I

78

1  don't know, I don't think I had secretaries; I had
2  girls that typed, three or four of them.
3     Q. Well, you testified in January of this year
4  when I came down here, you said -- I asked you, so your
5  secretary put this together? And you answered, I --
6  yeah. I don't type.
7     A. I don't.
8     Q. Do you recall that answer?
9     A. That's correct.
10    Q. Then I said, but you've testified before in a
11 proceeding that this resume was correct, didn't you?
12    A. I don't think I did.
13    Q. And you answered, I don't recall sending this.
14 I don't deny it.
15    A. I don't think I've ever misrepresented it. If
16 it's misrepresented there and you have asked me a
17 question about it, I think I would ask -- I haven't
18 read it all. If the --
19    Q. Do you deny --
20    A. No, I just -- I'm just giving you the truth.
21    Q. Do you deny sending the resume?
22    A. I don't recall it. I do not deny it, but I
23 don't recall it. It seems to me there would be a
24 transmittal letter or something, you wouldn't just -- I
25 don't know how they ended up with it. But the answer,

79

1  in fact, about it is that it already shows that I was
2  a technical advisor for Louisville Slugger, so it
3  evidently came after '89 or '90, sometime in there when
4  I did send it; so it wasn't a condition of employment
5  or anything like that.
6     Q. Also when I was down here in January I asked
7  you -- you testified -- I asked you: But you testified
8  on the record before that this resume is correct? And
9  you answered, yeah, it is correct. Was that false
10 testimony in January of this year when I asked you?
11    A. Evidently, if I said it is correct, that is
12 false testimony because it's not correct. And I think
13 Louisville found out during the lawsuit and got all my
14 transcripts and all. I think the first time Louisville
15 knew this was incorrect was during our lawsuit when
16 they subpoenaed all my college transcripts and
17 everything, and then we started hearing about it all,
18 after I had been gone a year. And for the life of me I
19 do not understand how me flunking out of college makes
20 metal baseball bats safe.
21    Q. Mr. MacKay, Exhibit 959 has a copy of your
22 transcript from Mississippi State; is that not correct?
23    A. Yes, I guess it is. This is what they
24 subpoenaed in the lawsuit, yes. This is when they were
25 aware that I did not graduate from college.

80

1     Q. And, Mr. MacKay, this resume -- or this
2  transcript indicates that you failed at least 14
3  courses at Mississippi State, doesn't it?
4     A. If you represent to me that's correct, then
5  that's probably correct.
6     Q. For example, you got an F in college algebra;
7  do you see that?
8     A. Yeah.
9     Q. Is that correct; you got an F in college
10 algebra?
11    A. Not at Mississippi State I didn't. That was
12 in Howard College in Birmingham.
13    Q. Oh, in Howard College you got an F?
14    A. Uh-huh.
15    Q. Okay. And the next semester you moved it up
16 to a C in college algebra; do you see that?
17    A. No, I didn't. Did I do that? Where are you?
18    Q. I'm looking at the 1959-60 --
19    A. Right here?
20    Q. Yes. Your second semester you got a C?
21    A. Yeah, I did a hell of an improvement.
22    Q. Okay. But the next year, 1960, if you're
23 looking down the fall quarter, you got an F in
24 trigonometry; do you see that?
25    A. Yeah, I got a F in -- I made a B in tennis. I

81

1  got an F in English composition, too. I got an F in
2  trigonometry and zoology. I got a D in English
3  composition.
4     Q. And then in 1961, you got a D in plain
5  trigonometry; do you see that?
6     A. I sure did. D in grammar and composition; F
7  in general botany. If you will notice down there, I
8  got a B in farm machinery.
9     Q. Now, Mr. MacKay, you testified you had a
10 certificate of credits in agricultural engineering and
11 animal husbandry. What were you talking about?
12    A. Well, I did real good in that in junior
13 college. When you get out -- I went to Howard, and
14 then Auburn, and Itawamba Junior College, and then
15 Mississippi State, and then Delta State.
16    Q. Where did you get that certificate of credits
17 in agricultural engineering --
18    A. That came out of --
19    Q. Let me finish the question. Where did you get
20 that certificate of credits in agricultural engineering
21 and animal husbandry?
22    A. I guess you're looking at it. Isn't that a
23 certificate of credits? It says I passed a few things.
24    MR. BUSH: Go off the record, please.
25    (Off the record at 11:16 a.m.)

21 (Pages 78 to 81)

150

1  160 miles an hour probably in every college game that
2  exists.
3        How many times that happens or what percentage
4  of time that happens, I do not have that figure, no.
5    Q. Thank you. Now, I think it's your view,
6  correct me if I'm wrong, that swing speed affects the
7  velocity of the ball off the bat a lot more than pitch
8  speed does?
9    A. No question, nine to one.
10   Q. So the collision speed is not the relevant
11 number, because that combines them both equally, right?
12   A. No. When you say collision speed, you could
13 have 160 if the guy threw 160 miles an hour and had a
14 bunt, that's collision speed. What you're really
15 saying is that somewhere -- they're going to be real
16 close to equal, usually the ball is faster, the pitch
17 falls faster.
18       A batter swinging at 70 and a guy hurrying it
19 up there at 90, and most college pitchers can throw
20 that; 70, 90, you got the 160 collision right there.
21   Q. Let me ask my question. If you have a
22 90-mile-an-hour pitch and a 70-mile-an-hour swing, --
23   A. 160-mile-an-hour collision.
24   Q. Well, it's a 160-mile-an-hour collision, but
25 that does not give you the same velocity of the bat off

151

1  the ball, in your view, as an 80-mile-an-hour pitch and
2  an 80-mile-an-hour --
3    A. That's correct. There's no guessing; that's
4  fact.
5    Q. Okay. So collision speed is not correlated
6  with the velocity of the ball off the bat; am I right?
7    A. The bat speed and ball speed, input speed need
8  to be controlled like they are at UMass, they just need
9  to be a lot higher than they are at UMass.
10   Q. So to get back where we were, when you did the
11 static testing at 93-mile-an-hour pitch speed -- I'm
12 sorry, 93-mile-an-hour swing speed off a T, did that
13 replicate typical game conditions or not?
14   A. No, I don't think it did. I think it was a
15 number that we could replicate in the cage with -- not
16 Division I hitters but, you know, good high school
17 players or maybe junior college players, which is what
18 we used most of the time. It's a number that we could
19 go test in there and know that's about what we received
20 in a high school or JUCO game.
21       We've seen balls that would hit 137 miles an
22 hour on four radar systems.
23   Q. The radar is not a very accurate way of
24 measuring speed of a ball --
25   A. Okay. They have timing lights on --

152

1    Q. Could I finish my question? Isn't it true
2  that radar is not a very accurate way of measuring the
3  velocity of a batted ball?
4    A. Very accurate if you've got the right type.
5  If you have a 60-cycle radar, it's very accurate, which
6  is what we used, plus you have timing lights.
7        I've seen many balls hit over 130 miles an
8  hour. Many, many. Hundreds.
9    Q. Did you -- in the kind of static testing you
10 did, did you ever do scientific testing in the sense
11 that you carefully measured what's the mean result,
12 what are the frequencies of other results, what is
13 statistically significant and what is not?
14   A. No, what we did, the way our tests were set
15 up, it was mostly an average. You would hit a bat ten
16 times at the three-inch point, and then hit a triangle
17 node on the three-inch point, and then move to five,
18 seven, and nine, and repeat those tests.
19       And then those, the top three were thrown out,
20 the bottom three were thrown out, and the average was
21 the four left standing for that particular node.
22   Q. Mr. MacKay, it's your view, is it not, that
23 you are not a research guy? You don't do research,
24 you're a gimmick guy, in your words; isn't that
25 correct?

153

1    A. I don't know what determines research. You'll
2  come back next week in some deposition and say I didn't
3  do research. I design bats. And early on I designed
4  them to hit as fast as Easton. And then when they
5  out-hit Easton, I tried to design them not to hit as
6  fast. And yes, there were a lot of gimmicks.
7    Q. Exhibit 979, does that appear to be some of
8  your testimony in your deposition in your case with
9  H and B?
10   A. Sure.
11   Q. Why don't you turn to page 35, and looking at
12 your answer on line 4.
13       MR. NELSON: What exhibit is this?
14       MR. ETTINGER: 979.
15   Q. (By Mr. Ettinger) Did you indicate there, I
16 don't do research. You've been misled. That's a great
17 name and all. I'm a gimmick guy.
18   A. Yeah.
19   Q. Is that truthful testimony?
20   A. Yes, it's truthful. I don't know what
21 constitutes research. I did a lot of testing. Is that
22 research or not? You tell me.
23   Q. Well, what did you mean when you said, I don't
24 do research?
25   A. I don't do like he was asking me earlier. I

154

1  don't know the formula of a C405, but give me a piece
2  of C405, and I'll tell you whether or not it's CU31 or
3  7050 or 7055.
4      Q. So what you do is not what people would
5  classify as, strictly speaking, scientific research; is
6  that right?
7      A. Hey, I flunked out of college. I'm not
8  prepared to do research. I just file for patents.
9      Q. Now, in your deposition, I went back and read
10 it, of course, and you mentioned kinetic energy. Do
11 you know the formula for kinetic energy?
12     A. I have it somewhere, yes; I don't know it
13 offhand, no.
14     Q. Okay. Do you know the formula for moment of
15 inertia?
16     A. I have it somewhere; no, I don't keep it in my
17 mind.
18     Q. Okay. Do you know what the term free body
19 means in physics?
20     A. I think in batmaking it means in free swing.
21 I don't know. I really do not know -- are you talking
22 about a ball, bat?
23     Q. I'm talking about the general term in physics;
24 do you know what the term free body means?
25     A. Probably not.

155

1      Q. Do you know what the radius of gyration is and
2  what the formulas is for the radius of gyration?
3      A. We call it vibration down here. In the BPF
4  test there was a formula for figuring that up.
5      Q. Do you know that formula?
6      A. I don't know it by memory, no.
7      Q. You referred to drag in your deposition. Did
8  you know --
9      A. Drag crisis.
10     Q. Do you know any of the equations that are used
11 to calculate --
12     A. No, sir. I've got all that, and when you use
13 them, you take a computer to figure it out.
14     Q. Did you ever take a physics course in your
15 life?
16     A. I don't know.
17        THE WITNESS: Did I, Mr. Bush?
18     Q. (By Mr. Ettinger) I didn't see it on your
19 transcripts.
20     A. I probably flunked it if I did.
21        MR. BUSH: The closest we found was algebra.
22     A. I never got out of algebra.
23     Q. (By Mr. Ettinger) And you never took a
24 statistics course, did you?
25     A. Hey, you've got a 40-year-old transcript; you

156

1  tell me.
2      Q. I don't see it, but I don't know everything
3  you took at Delta, for example, so do you recall ever
4  taking a statistics course?
5      A. I don't think I have.
6      Q. Do you know what statistical significance is?
7      A. I'm not as educated as you.
8      Q. I'm not trying to criticize, I'm just asking
9  some questions.
10     A. We've already established that I flunked out
11 of college and I'm very dumb.
12     Q. Could you answer my question? Do you know
13 what statistical significance is?
14     A. Yes, sir.
15     Q. What is it?
16     A. It's when the statistics show that there is a
17 spike or there is a meaning -- what it means to me is
18 that it -- statistically you can repeat it, and you see
19 a spike or you see a trend. That's country talk for
20 it's not just some linear equation you run out, it's
21 actually something that means it's repeatable from test
22 to test, then it's statistically significant.
23     Q. Are you knowledgeable about any particular
24 tests of statistical significance?
25     A. I don't know whether you would consider the

157

1  testing I did as a -- where we had repeatability and we
2  actually could forecast what the bat was swung to
3  before, whether that would fall into your definition of
4  what was --
5      Q. Well, let me try to explain what I mean.
6  Statistic books have various tests for statistical
7  significance that people design to --
8      A. You --
9      Q. Let me just finish. There is a T-test, there
10 is an F-test, there is a chi-square test; are you
11 specifically familiar with any tests --
12     A. No, sir, I am certainly not.
13     Q. Do you have a computer program about bat
14 liveliness?
15     A. Do I have a -- I don't have a computer program
16 about anything.
17     Q. That's what I thought. Let me show you this.
18 Mr. MacKay, I'm showing you Exhibit 980, which is a
19 memo from Bill Thurston to Ted Breidenthal, July 23,
20 1998. It starts out, here is some information Jack
21 MacKay gave me concerning testing bats.
22        And going down four paragraphs, it says, Jack
23 gave me some numbers that he came up with off his
24 computer program concerning bat liveliness.
25        Now, is Mr. Thurston smoking something, or did