UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────

USA BASEBALL; THE NATIONAL HIGH SCHOOL
BASEBALL COACHES ASSOCIATION; DR. PETER
BERG; JUAN HERNANDEZ; DENNIS CANALE;
MEL ZITTER; MICHAEL CRUZ; TITO NAVARRO;
JOHN TORRES; EASTON SPORTS, INC.;
WILSON SPORTING GOODS CO.; RAWLINGS
SPORTING GOODS COMPANY; and HILLERICH &
BRADSBY COMPANY, INC.,

                    Plaintiffs,

                                        07 Civ. 3605 (JGK)

         - against -
                                        OPINION AND ORDER

CITY OF NEW YORK,

                    Defendant.
──────────────────────────────

JOHN G. KOELTL, District Judge:

     At issue in this case is whether the New York City Council

acted constitutionally in limiting the types of bats high school

age students use in competitive baseball games, and more

particularly by excluding the use of metal bats.  In Local Law 20

of 2007 (the "Bat Ordinance"), the New York City Council

determined the kinds of bats students of high school age may use

in competitive baseball games sponsored by public or private

schools in the City.  In these contexts, the Bat Ordinance

permits the use of only (i) wood bats or (ii) wood laminated or

wood composite bats that are approved by Major League Baseball

("MLB"), pursuant to its official rules, for major league or

minor league baseball play, provided that no permitted bats can

include any metal.  See N.Y.C. Admin. Code § 10-165.

The plaintiffs, who include coaches and parents of New York City high school baseballs players, manufacturers of sporting goods, the National High School Baseball Coaches Association, and USA Baseball, an organization devoted to promoting amateur baseball in the United States, bring this action to enjoin the enforcement of the Bat Ordinance.  The plaintiffs move simultaneously for summary judgment or, in the alternative, a preliminary injunction to take effect in advance of September 1, 2007, the effective date of the Bat Ordinance.  They raise a host of arguments for why the Bat Ordinance should not stand, including that it violates the due process and equal protection clauses of the federal and state constitutions, that it is beyond the police power of the City, that it is an unconstitutional delegation of lawmaking authority, and that it violates the dormant Commerce Clause.  The defendant, the City of New York, has opposed those motions and cross-moved for summary judgment dismissing the Complaint because it claims as a matter of law the plaintiffs cannot succeed on any of their claims.  As explained below, the City Council could constitutionally make the legislative choice that promoting the safety of high school age students in competitive baseball games was more important than increasing the performance statistics of those players.

For the reasons stated below, the plaintiffs' motion for summary judgment is **denied** and the defendant's cross-motion for

summary judgment dismissing the Complaint is **granted**.  The
plaintiffs' motion for a preliminary injunction is therefore
**denied**.


                              I.

                              A.

     The following facts relating to the City Council's decision
to enact the Bat Ordinance are undisputed unless otherwise noted.

     On September 27, 2002, the New York City Council held a
public hearing relating to a bill prohibiting the use of non-wood
bats by minors in competitive baseball games.  (Decl. of Lauren
Popa ¶ 8.)  The Youth Services Committee of the City Council held
public hearings on a later bill that eventually became the Bat
Ordinance on October 23, 2006 and March 12, 2007.  (<u>Id.</u> ¶ 10.)
On March 12, 2007, the Youth Services Committee voted to
recommend the bill to the full Council.  (<u>Id.</u>)  On March 14,
2007, the full Council adopted the bill by a vote of 40 to 6.
(<u>Id.</u> ¶ 11.)  On April 4, 2007, Mayor Michael Bloomberg vetoed the
bill, and on April 18, 2007 the Youth Services Committee held an
additional public hearing.  (<u>Id.</u>)  On April 23, 2007, the full
Council overrode the Mayor's veto by a vote of 41 to 4, and it
thereby enacted the Bat Ordinance.  (<u>Id.</u>)

     The Bat Ordinance amended title 10 of the New York City
Administrative Code by adding the following section:

                              3

§ 10-165  Prohibition of use of non-wood bats.
a.  Definitions.  When used herein, the following
terms shall have the following meanings:
  1.  "Competitive baseball game" shall mean any
organized baseball game at which a certified
umpire officiates and which takes place in the
city of New York.
  2.  "High school age children" shall mean
persons older than thirteen years of age, but
younger than eighteen years of age.
  3.  "School" shall mean any public or private
school which includes any grade nine through
twelve and which is located in the city of New
York.
  4.  "Wood bat" shall mean any baseball bat
constructed exclusively of wood or any wood
laminated or wood composite bat, which is approved
by major league baseball, pursuant to such
organization's official rules, for major league or
minor league baseball play; provided that such
term shall not include any bat made in whole or in
part of metal, including, but not limited to,
aluminum, magnesium, scandium, titanium or any
other alloy compound.
b.  Only wood bats shall be used in any competitive
baseball game in which high school age children are
participants and which involves the participation
and/or sponsorship of a school.

N.Y.C. Admin. Code § 10-165.  The Declaration of legislative

findings and intent approved as part of Local Law 20 states:

"The Council hereby finds that the use of non-wood bats poses an

unacceptable risk of injury to children, particularly those who

play competitive high school baseball."  (N.Y. City Council Comm.

Rep. ("Comm. Rep.") at 16, Ex. 1 to Decl. of Jerald Horowitz.)

     MLB only allows bats made from solid wood in its games, but

it allows the use of composite bats that it has evaluated and

approved as comparable to "one-piece solid northern white ash

bats" in the Minor League short-season.  (Ex. 21 to Horowitz
Decl. at 2.)  MLB approves bats that have been scientifically
evaluated by the University of Massachusetts Lowell Baseball
Research Center.  (Id.)  The testing protocol includes tests for
physical characteristics such as length, weight, barrel diameter,
center of gravity, and mass moment of inertia ("MOI"), vibration
testing, batted-ball performance testing including a test to
determine the "Ball Exit Speed Ratio" ("BESR"), static strength
and flexural stiffness testing, and high-speed durability
testing.  (Id. at 2-4.)

     The legislative record of the Bat Ordinance comprises
approximately 3,500 pages of testimony, statements, reports, and
other documents.  (Horowitz Decl. ¶ 2.)  At the Youth Services
Committee hearings, the Council heard testimony from parents,
coaches and players relating to the risks of injuries associated
with the use of high-performing non-wood bats.  (Popa Decl.
¶ 12.)  A mother whose son was killed by a ball struck by a non-
wood bat testified that "Brandon didn't have a chance.  There was
no way he was ever going to react."  (Oct. 23, 2006 Comm. Hr'g
Tr. 110, Ex. 16 to Horowitz Decl.)  A father whose son was
seriously injured by a ball struck by a non-wood bat testified
that "he was struck by a line drive that I just barely seen the
ball make contact with the bat. . . . He had no time to react

5

whatsoever." (Oct. 23, 2006 Comm. Hr'g Tr. 179; see also Popa Decl. ¶ 26.)

At another hearing before the Youth Services Committee, former Mets pitcher John Franco testified that when he now throws at batting practices for some high school teams who use non-wood bats, "while the ball is just getting out of my hand, it's already hitting the net, and I don't even see it coming at me. It's dangerous. It's very, very dangerous. . . . I'm speaking from someone who is standing on the mound for 22 years and I can see the difference." (March 12, 2007 Comm. Hr'g Tr. 6, Ex. 17 to Horowitz Decl.) A coach at a New York City high school testified that he did not perceive a difference in the speed of balls struck by wood and metal bats, but that

> [t]he difference is in a wood bat there is a sweet spot that they call, it's a little area that when you hit the ball there, that's the best spot where the ball is going to fly off the bat. . . . With a metal bat, it's not going to go further, but there is more of an area where you can hit it and you can get a base hit. So, in other words, you're making some bad hitters into good hitters, because they have a larger area to hit with, but I do not see any balls flying off the bat any quicker.

(Id. at 15-16.)

Currently, until the Bat Ordinance takes effect, high-school sponsored leagues in New York City must use bats that meet standards adopted by the National Federation of High Schools ("NFHS"), which has adopted the same standards used by the

6

National Collegiate Athletic Association ("NCAA"). (Popa Decl. ¶ 13; Def.'s 56.1 Stmt. ¶ 53.) The Youth Services Committee's Report on the Bat Ordinance, dated April 18, 2007 and issued in advance of the vote to override the Mayor's veto, reviewed the NCAA's standards and the decision-making process that led to their adoption. (Comm. Rep. at 3-11.) The Report describes how the NCAA adopted bat performance standards to be effective in 1999 that, among other requirements, imposed a maximum batted-ball exit velocity of 93 miles per hour. (Id. at 3.) The exit velocity limit was based on research suggesting that it takes 0.4 seconds on average for a pitcher to react to a ball hit from home plate to the pitcher's mound, which the NCAA found corresponded to a maximum exit velocity of 93 miles per hour. (Id.) The Report notes that Easton Sports, Inc., a manufacturer of metal bats and a plaintiff in this action, filed a restraint-of-trade lawsuit against the NCAA in 1998, and that in 1999 the NCAA's Executive Committee voted to suspend the proposed regulation of non-wood bats until further testing could be done. (Id. at 4-5.) The NCAA Executive Committee ultimately approved a batted-ball exit velocity limit of 97 miles per hour, among other requirements, which the Report stated "represents an about-face for the NCAA Executive Committee," and the Report notes that Easton Sports dropped its lawsuit.[1] (Id. at 5-6.) The current

_____

[1] The plaintiffs submitted a declaration explaining that the original

exit speed test used by the NCAA, the BESR test, is the same test employed by MLB.  (See Decl. of Dewey Chauvin ¶ 14; Second Chauvin Decl. ¶ 16.)  The Committee's Report indicates that the NCAA's current MOI requirement is not comparable to the MOI of wood bats.  (Comm. Rep. at 8.)

The legislative record before the City Council also included several studies and reports that explain the differences between wood and non-wood bats and that indicate that non-wood bats that meet the current NCAA and NFHS standards can outperform wood bats.  (See Exs. 10, 11, 12, 13, 14, 22, 25 to Horowitz Decl.) Several reports refer to a number of ways in which non-wood bats can be engineered to increase their performance, including adjustments to the MOI, the "trampoline" effect, and the "sweet spot."  (See, e.g., Exs. 10, 14 to Horowitz Decl.)  The record also included a report that stated wood composite bats are durable and cost-effective and perform like pure wood bats.  (See Ex. 25 to Horowitz Decl.)

The legislative record also included evidence showing that several local leagues, including the Nassau Suffolk County Catholic High School Athletic Association, the Prospect Park Baseball Association, and the Garden City Athletic Association,

---

calculation of 93 miles per hour was a miscalculation that did not take account of air resistance and that the NCAA commissioned a scientific panel to guide the regulatory process and propose the current standards.  (See Second Decl. of Dewey Chauvin ¶¶ 6-10.)

had recently switched to wood or wood composite only policies. (See Comm. Rep. at 13-14; Ex. 23 to Horowitz Decl.)

**B.**

The following facts about the characteristics of baseball bats are undisputed.

Baseball bats on the market are made of wood, composite, or metal material. Wood bats are made from a piece of solid wood. (Def.'s 56.1 Stmt.¶ 35.) Non-wood bats make use of metal alloys and advanced technology that can increase performance. (Id. ¶ 37.) Metal bats that meet NCAA and NFHS standards have a "trampoline effect" that can affect performance, and the mass can be distributed closer to the handle than in wood bats giving the non-wood bats a lower MOI and making them easier and quicker to swing. (See Id. ¶¶ 39, 42-43.) Non-wood bats also often have a larger "sweet spot," which enables hitters to make solid contact without perfectly centering the bat on the ball and thereby results in more "offense." (See, e.g., id. ¶¶ 40-41; Decl. of Paul Seiler ¶ 10; Decl. of Dennis Canale ¶ 8; Second Decl. of Art Chou ¶ 3; Second Chauvin Decl. ¶ 2; Compl. ¶ 42 ("Moreover, metal and nonwood composite bats usually have a larger 'sweet spot' . . . .").)

Some players have been either mortally or seriously injured from a ball hit off a metal or composite bat in competitive high

school level baseball games.  (Def.'s 56.1 Stmt. ¶ 32; Popa Decl.
¶¶ 26-27; Decl. of Richard Greenwald ¶ 3; see also Compl. ¶ 36.)
Players have also been injured by wood bats.  (See Ex. N to
Second Chauvin Decl.)


## II.

The standard for granting summary judgment is well
established.  Summary judgment may not be granted unless "the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd.
P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's
task at the summary judgment motion stage of the litigation is
carefully limited to discerning whether there are genuine issues
of material fact to be tried, not to deciding them.  Its duty, in
short, is confined at this point to issue-finding; it does not
extend to issue-resolution."  Gallo, 22 F.3d at 1224.  The moving
party bears the initial burden of informing the district court of
the basis for its motion and identifying the matter that it
believes demonstrates the absence of a genuine issue of material
fact.  Celotex, 477 U.S. at 323.  The substantive law governing

the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).

### III.

The plaintiffs raise a variety of arguments for why the Bat Ordinance is unconstitutional under the federal and New York State constitutions and unauthorized under New York law.  Their arguments center around an alleged deficiency of the City's primary stated justification for the regulation--to protect high school age students from the risk of injury--when the plaintiffs assert there is no empirical evidence to show that the regulation will meet any safety objective.  The City contends that each of these arguments fails as a matter of law and that the Court should therefore grant summary judgment dismissing the Complaint. The plaintiffs' arguments are addressed in turn.

### A.

The plaintiffs first allege that the Bat Ordinance violates equal protection and due process rights under the federal and New York State constitutions and that it exceeds the City's police powers under New York General City Law § 20(13).  The arguments are considered seriatim although the arguments and analysis are intertwined.

### 1.

Where, as here, a law does not interfere with a fundamental right or proceed along suspect lines, the classification or

distinction drawn by the law "cannot run afoul of the [United States Constitution's] Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate government purpose." Heller v. Doe, 509 U.S. 312, 320 (1993). This rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Id. at 319 (citing FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993)). Moreover, the legislature that created the classification "need not actually articulate at any time the purpose or rationale supporting its classification," and it has no obligation to produce evidence to sustain the rationality of its classification. Id. at 320 (internal quotation marks omitted). The classification must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." Id. (quoting Beach, 508 U.S. at 313). The party attacking the classification must "negative every conceivable basis which might support it" to prevail. Id. (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)). Finally, a classification need not form a perfect fit between means and ends to satisfy rational-basis review. Id. at 321 (citing Dandridge v. Williams, 397 U.S. 471, 485 (1970)). Where the legislature engages in line drawing, "the precise coordinates of the resulting legislative judgment [are] virtually unreviewable, since the legislature must be

allowed leeway to approach a perceived problem incrementally."
Beach, 508 U.S. at 316 (citing Williamson v. Lee Optical of
Okla., Inc., 348 U.S. 483, 489 (1955)).

As an initial matter, it is unclear what "classification"
the plaintiffs raise that is subject to any constitutional
protection because they have not explained how the bar against
the use of metal and non-wood composite bats actually treats any
entity or individual differently from others.[2]  Setting aside this
lack of clarity in the pleading, the plaintiffs allege that there
is no scientific evidence that metal or other non-wood bats
create a higher risk of injury than wood bats, and therefore the
City Council's primary stated justification for the ordinance has
no rational underpinning.  They further allege that no rational
distinction exists between "wood laminate or wood composite bats"
that contain only small amounts of wood yet are allowed under the
ordinance if they are approved by MLB, and other composite bats
that do not contain wood.

---

[2]  For example, the plaintiffs make no suggestion that some manufacturers
only produce non-wood bats and would therefore be disadvantaged relative to
wood bat producers.  While a discriminatory effect need not be expressed
nakedly in the classification at issue, see, e.g., Yick Wo v. Hopkins, 118 U.S.
356, 373-74 (1886) (finding ordinance limiting laundries in San Francisco to
buildings "constructed either of brick or of stone" in fact discriminated
against Chinese residents and thus violated the Equal Protection Clause),
certainly the plaintiffs must show some discriminatory effect on a person or
entity the Constitution was intended to protect, rather than an inanimate
sporting good, in order to invoke the Equal Protection Clause, see, e.g.,
Atchison, T. & S.F.R. Co. v. Matthews, 174 U.S. 96, 104 (1899) ("[T]he equal
protection guarantied by the constitution forbids the legislature to select a
person, natural or artificial, and impose upon him or it burdens and
liabilities which are not cast upon others similarly situated.").

In so arguing, the plaintiffs seek to discount any possibility of enhanced risk due to batted-ball exit speed in light of the current NCAA and NFHS guidelines that reduced non-wood bats' exit speeds. The plaintiffs then attempt to place the evidentiary burden on the City to produce scientific evidence that the current guidelines are insufficient to protect students. This entire approach is wrong under rational basis review. The City had a rational basis for its distinction based upon the testimony and studies presented to it even if its ultimate choice could be disputed. Moreover, it is unnecessary to focus only on exit speeds, which the plaintiffs assert are now on a relative par between wood bats and metal and composite bats, to see that a rational basis exists for legislatively determining that metal and composite bats could nonetheless result in an increased risk of injury to infielders from hard-struck balls.

The plaintiffs suggest in their Complaint, and many of their declarants agree, that metal and composite bats have larger "sweet spots" than traditional wood bats and therefore produce more hits and greater offense. (See, e.g., Seiler Decl. ¶ 10; Canale Decl. ¶ 8; Second Chou Decl. ¶ 3; Second Chauvin Decl. ¶ 2; Compl. ¶ 42.) The bat manufacturers advertise their metal and composite bats as having a "trampoline" effect, more "pop," larger "sweet spots," and better performance than other bats (see, e.g., Exs. 3, 4, 5 to Horowitz Decl.), and there is

substantial evidence that it is these bats' greater performance
that makes them attractive to coaches and players (see, e.g.,
Decl. of John Torres ¶ 4; Decl. of Michael Cruz ¶¶ 3, 5; Decl. of
Dr. Peter Berg ¶ 4; Canale Decl. ¶¶ 8-9.)  Even if the plaintiffs
were correct that exit speeds for non-wood bats are no greater
than for wood bats under the existing NCAA and NFHS regulations,
it would be not only rational but logical to conclude that a
greater number of hard-struck balls flying through the infield,
even at the same exit speed, results in a greater chance that an
infielder could be struck and injured.  It is indeed ironic that
the plaintiffs would promote the use of non-wood bats to increase
the batting performance of hitters and yet seek to avoid the
consequences of more balls hit at the players in the field.

     The provisions of the Bat Ordinance appear to address this
concern about injuries to infielders from more frequent hard hits
by limiting the bats to be used in New York City high school
baseball games to those that perform the same as solid wood bats
in order to limit the offensive statistics to a safer level.  The
City accomplishes this limitation by incorporating MLB's
restrictions on composite bats and by disallowing all metal bats.
The evidence shows that MLB's tests scrutinize more physical
characteristics of the bat than the currently applicable testing
methods used by the NCAA and NFHS.  (See Ex. 21 to Horowitz
Decl.)  The plaintiffs repeatedly assert that because metal and

16

composite bats can be calibrated to a wide range of specifications, it is unfair to say that all non-wood bats have larger sweet spots or other high-performance characteristics. But this assertion cannot rebut the market reality, which the plaintiffs' submissions themselves admit (see, e.g., Def.'s 56.1 Stmt. ¶¶ 40-41; Seiler Decl. ¶ 10; Canale Decl. ¶ 8; Greenwald Decl. ¶ 8; Second Chou Decl. ¶ 3; Second Chauvin Decl. ¶ 2; Compl. ¶ 42), that many existing metal and composite bats do produce more hits than wood bats.

In short, the judgment that high school baseball players' safety is more important than higher batting averages and more offense is a classic legislative judgment that the City Council could constitutionally make.[3]

This rational link between a perceived danger and the Bat Ordinance distinguishes this case from the federal Equal Protection decisions relied on by the plaintiffs, where the legislative classifications bore no plausible relationship to a legitimate purpose. Cf. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 450 (1985) (invalidating as applied zoning ordinance relating to group homes that put greater restrictions on mentally retarded persons); Zobel v. Williams,

---

[3] Because the Court has found that a conceivable rational relationship exists between the Bat Ordinance and the legitimate purpose of public safety, it is not necessary to evaluate the suitability of the City Council's alternative stated purpose of protecting the "traditions and integrity" of the game of baseball.

457 U.S. 55, 65 (1982) (invalidating law that based oil revenue payments to Alaska residents on their years of residency).

The plaintiffs' additional argument that there is no basis for distinguishing between non-wood composites and wood composites or wood laminates also fails.  The City Council may act incrementally or draw the line imperfectly so long as there was, as the Court has concluded, a conceivable rational connection between the classification drawn and a legitimate purpose.  See Beach, 508 U.S. at 316; see also Jankowski-Burczyk v. INS, 291 F.3d 172, 179 (2d Cir. 2002) ("It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."  (internal quotation marks omitted)).  The City Council chose to make use of MLB's expertise in drawing the line to permit more than pure wood bats.  The line drawn does not arbitrarily include all wood composites and wood laminates, but only those that satisfy MLB's performance criteria.  Furthermore, record evidence that was before the City Council suggests that existing wood composite bats are more durable than wood bats but perform more similarly to wood bats than non-wood bats (see Oct. 23, 2006 Comm. Hr'g Tr. at 115, Ex. 16 to Horowitz Decl.; Ex. 25 to Horowitz Decl. at 2), which provides a reasonable explanation for why the City could have drawn the line to include wood composite bats at all.

Similarly, the plaintiffs' suggestion that the City could achieve the same purpose in a less restrictive way by imposing technical performance specifications on bats of all compositions, rather than excluding all metal bats, is unavailing.  The City need not adopt the least restrictive alternative; it has wide latitude in formulating its legislative response to a legitimate perceived problem.

Therefore, because a rational basis exists for the City Council's classification and because this Court should not second-guess the Council's legislative choices, the Court concludes as a matter of law that no claim under the federal Equal Protection Clause lies.  Similarly, because the New York State Constitution's equal protection clause is "no broader in coverage than the Federal provision," Hernandez v. Robles, 855 N.E.2d 1, 9 (2006) (quoting Under 21, Catholic Home Bur. for Dependent Children v. City of New York, 482 N.E.2d 1, 8 n.6 (N.Y. 1985)); see also Countryman v. Schmitt, 673 N.Y.S.2d 521, (Sup. Ct. 1998) ("New York's Equal Protection Clause is construed in pari material with its Federal analog."), the Bat Ordinance does not violate the state equal protection clause for the reasons already explained.

**2.**

The plaintiffs' arguments with respect to the federal Due
Process Clause fare no better.  The same rational-basis standard
of review described above applies to substantive due process
claims where, as here, the legislative act at issue does not
impinge upon a fundamental right.  See, e.g., Beatie v. City of
New York, 123 F.3d 707, 709, 712-713 (2d Cir. 1997) (affirming
summary judgment dismissing substantive due process challenge to
anti-smoking ordinance under the rational basis standard); New
York City Friends of Ferrets v. City of New York, 876 F. Supp.
529, 534 (S.D.N.Y. 1995) ("Where, as here, the exercise of police
power does not affect fundamental rights . . . we apply the same
rational basis analysis used under the constitutional guarantee
of equal protection.").  The plaintiffs' claims under the federal
Due Process Clause therefore fail as a matter of law for the
reasons stated above.

The plaintiffs concede that New York courts have articulated
the same standard for reviewing constitutionality under the New
York State Constitution's due process provision, but they contend
that New York courts have more frequently invalidated legislation
on substantive due process grounds.  See, e.g., Hernandez, 855
N.E.2d at 9 ("In general, we have used the same analytical
framework as the Supreme Court in considering due process cases,
though our analysis may lead to different results.").  However,

the New York Court of Appeals has recently noted that cases where
New York has found its due process clause affords greater
protection than its federal analogue usually involve the rights
of criminal defendants or prisoners, which are not implicated
here.  Hernandez, 855 N.E.2d at 9; see also id. at 14 (Graffeo,
J., concurring) ("Although our Court has interpreted the New York
Due Process Clause more broadly than its federal counterpart on a
few occasions, all of those cases involved the rights of criminal
defendants, prisoners or pretrial detainees, or other confined
individuals and implicated classic liberty concerns . . . .").

    In another line of somewhat older cases, New York courts
have occasionally struck down on due process grounds legislation
which seriously affected economic interests.  See, e.g., Trio
Distrib. Corp. v. City of Albany, 143 N.E.2d 329, 331-32 (N.Y.
1957) (finding ordinance requiring vendors who sell to children
from vehicles in the public streets to be accompanied by an
attendant to safeguard the children imposed a prohibitive costs
and was unconstitutional); Defiance Milk Prods. Co. v. Du Mond,
132 N.E.2d 829, 830-31 (N.Y. 1956) (invalidating ordinance
prohibiting the sale of condensed or evaporated skim milk in
containers holding less than ten pounds); see also Town of North
Hempstead v. Exxon Corp., 421 N.E.2d 834, 838 (N.Y. 1981)
(Fuchsberg, J., concurring) (noting that New York courts have
applied the New York due process clause to scrutinize and in some

21

cases invalidate "economic legislation").  In these cases, the courts found that, despite the presence of a proper objective, the legislation adopted was not reasonably calculated to achieve that objective.  See Trio Distrib. Corp., 143 N.E.2d at 695; Defiance Milk Prods., 132 N.E.2d at 830-31.  In contrast to the enactments invalidated in this line of cases, the Bat Ordinance has a rational relationship to the legitimate purpose of protecting the public safety, as explained above, and therefore the ordinance does not fail for having too attenuated a connection to its intended purpose.

Other New York decisions cited by the plaintiffs that have invalidated legislation on state due process grounds are similarly distinguishable because they lack the kind of rational relationship between means and ends that exists here.  Cf. Russell v. Town of Pittsford, 464 N.Y.S.2d 906, 909 (App. Div. 1983) (ordinance preventing peddler from standing in a public place except in response to a request to purchase had no reasonable nexus with town's stated objective); People v. Buckley, 536 N.Y.S.2d 948, 263-67 (Dist. Ct. 1989) (prohibition of privately owned beach chairs at a municipal beach bore no reasonable relationship to its asserted purposes); Rauscher v. Village of Boonville, 499 N.Y.S.2d 832, 834-35 (Sup. Ct. 1986) (license fees unreasonably exceeded the necessary expense of regulating the intended business).

In connection with their state due process arguments, the plaintiffs also contend that the Bat Ordinance exceeds the City's statutorily authorized police power.  In particular, the plaintiffs argue that the Bat Ordinance constitutes a "prohibition" rather than a mere "regulation," and that such a prohibition is beyond the City's power to "regulate and license occupations and businesses" to "maintain order, enforce the laws, protect property and preserve and care for the safety, health, comfort and general welfare of the inhabitants of the city and visitors thereto."  N.Y. Gen. City Law § 20(13).  The plaintiffs rely on some New York state court decisions that include language distinguishing outright "prohibition" from regulation.  See, e.g., S.E. Nichols Herkimer Corp. v. Herkimer, 312 N.Y.S.2d 22, 24 (App. Div. 1970) ("Prohibition is not the equivalent of regulation."  (citation omitted)); Koston v. Town of Newburgh, 256 N.Y.S.2d 837, 839 (Sup. Ct. 1965) (quoting Good Humor Corp. v. New York, 36 N.Y.S.2d 85, 90 (App. Div. 1942), aff'd, 49 N.E.2d 153 (1943)) ("The power of regulation is not inclusive of the power of prohibition."); People v. Federico, 409 N.Y.S.2d 177, 178 (App. Term 1978) (per curiam) ("[A] sharp distincton is made between those [enactments] which ban activities completely and those which merely impose certain limitations on activities.").

The City responds that its home rule and police powers are broader pursuant to Article IX, Section 2(c) of the New York State Constitution, New York Home Rule Law § 10(1)(a)(12), and New York General City Law § 20(13) than the plaintiffs suggest. These provisions give the City the power to enact laws for the "safety, health, well-being, and welfare" of its residents. The City asserts that the Bat Ordinance does not constitute a "prohibition" because it does not condemn all use of non-wood bats. It bars their use in competitive high school baseball games, but not for example in high school practices, junior high school games, "pick up" games, or youth league games that are not school-sponsored. Moreover, the City persuasively argues that the suggested distinction between "prohibitions" and other "regulations" is artificial and untenable, because all regulations prohibit some conduct that is incompatible with the regulatory standards and all "prohibitions" leave some conduct untouched. For example, a New York court upheld as a valid exercise of the police power a New York City law banning the possession in a public place of a knife with a blade of at least four inches in length in People v. Ortiz, 479 N.Y.S.2d 613, 620 (Crim. Ct. 1984). The plaintiffs suggest the law at issue in Ortiz was a not a "prohibition," but it appears to be at least as complete a prohibition as the Bat Ordinance, which prohibits only certain uses of bats with certain defined characteristics.

24

Moreover, as the City points out, the cases on which the plaintiffs rely to suggest that outright prohibitions are not authorized under the City's police powers do not support such a broad rule on closer inspection.  Many of the decisions relate to zoning and implicate the considerable body of law related to the regulation of real property, and they are therefore plainly distinguishable from the kind of regulation imposed by the Bat Ordinance.  See, e.g., Cellular Tel. Co. v. Village of Tarrytown, 624 N.Y.S.2d 170, 175-77 (App. Div. 1995) (moratorium on the installation of cellular telephone antennae was not a valid exercise of zoning or police powers); Louhal Props., Inc. v. Strada, 743 N.Y.S.2d 810, 816-17 (Sup. Ct. 2002) (zoning ordinance requiring businesses operating near residences to close during late-night hours was overbroad and an unreasonable regulation of business operations); Koston, 256 N.Y.S.2d at 839-40 (zoning ordinance absolutely prohibiting trailer camps within the town did not reasonably relate to the health, safety, morals, or welfare and exceeded town's specific statutory power under N.Y. Town Law § 130(21) to regulate trailer camps).  Other decisions striking "prohibitions" did so in light of a more limited statutory grant than is present here under the City's broad home rule and police powers.  See S.E. Nichols Herkimer, 312 N.Y.S.2d at 25 (village's prohibition of commerce on holidays exceeded specific statutory authorization pursuant to N.Y. Gen.

Mun. Law § 86); Koston, 256 N.Y.S.2d at 839-40; Peace v. McAdoo, 96 N.Y.S. 1039, 1040-41 (App. Div. 1905) (delegation of power to the police commissioner to regulate street traffic did not include power to prohibit the passage of all vehicles). Still others arose in the context of criminal convictions and appear to have involved concerns about overbreadth of criminal laws. See People v. Bunis, 172 N.E.2d 273, 274 (N.Y. 1961); Federico, 409 N.Y.S.2d at 178.[4] None of these cases therefore suggests that New York courts find all exercises of a municipality's broad police powers which plausibly can be described as "prohibitions" of some conduct to be unlawful.

For all of these reasons, the plaintiffs have failed to show that New York's due process clause or its statutory grant of police powers to the City of New York require a more stringent analysis than an examination of whether the legislation at issue bears a reasonable relationship to a legitimate purpose within the City's police powers. Protecting persons of high school age from baseball injuries plainly falls within the City's police power to protect its residents' health and safety, and the Court has already concluded as a matter of law that the Bat Ordinance reasonably relates to this legislative purpose.

---

[4] The succinct Federico decision appears to have turned on a "lack of reasonable relationship to the valid exercise of police power," 409 N.Y.S.2d at 178, although the court never explains whether the purpose of the ordinance was safety or some other concern.

The City is therefore entitled to judgment dismissing the plaintiffs' claims based upon the federal and state equal protection and due process clauses and upon any lack of statutory authorization for the City's action.

**B.**

The plaintiffs next contend that the Bat Ordinance constitutes an unconstitutional delegation of power to a non-state entity in violation of both federal and state due process requirements because it incorporates the official rules of a private body--Major League Baseball--to determine which wood laminate and wood composite bats are acceptable.

The federal Due Process Clause limits the manner and extent to which a state legislature may delegate legislative authority to a private party.  See, e.g., Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 121-22 (1928); Gen. Elec. Co. v. N.Y. State Dep't of Labor, 936 F.2d 1448, 1455 (2d Cir. 1991) ("[A] legislative body may not constitutionally delegate to private parties the power to determine the nature of rights to property . . . without supplying standards to guide the private parties' discretion.").  Similarly, the New York State Constitution prohibits local legislative bodies acting under a statutory grant of power to "relinquish legislative functions to private individuals or to a private association or corporation"

unless "certain standards are created and the municipality
continues to control the authority." People v. Mobil Oil Corp.,
422 N.Y.S.2d 589, 591 (Dist. Ct. 1979).

The Bat Ordinance merely incorporates by reference a set of
rules adopted by a private organization with considerable
expertise in evaluating the specifications of baseball bats. New
York courts have distinguished the incorporation of professional
standards and codes from the kinds of delegations of sovereign or
legislative functions that are impermissible under federal and
state constitutional law. See, e.g., People v. Shore Realty
Corp., 486 N.Y.S.2d 124, 127 (Dist. Ct. 1984) (finding Nassau
County Fire Prevention Ordinance which incorporated the standards
of the private National Fire Protection Association "provides
adequate notice of the conduct proscribed and does not effect an
unconstitutional delegation of legislative power"); Syracuse v.
Penny, 300 N.Y.S.2d 679, 683 (Sup. Ct. 1969) (Cardamone, J.)
(finding that Syracuse Common Council "has not delegated its
lawful authority to set the standards by which electrical work is
to be done" but rather "merely adopted the National Electrical
Code and has incorporated this code into its ordinance").
Incorporations of standards created by private organizations have
also passed constitutional muster under federal law. See Towne
Constr. Co. v. Occupational Safety & Health Review Comm'n, 847
F.2d 1187, 1190 (6th Cir. 1988) (per curiam) (finding no

constitutional problem with OSHA's requirement that crane operators comply with crane manufacturers' load limitations and noting "[t]he physical impossibility of requiring OSHA independently to set safety standards for every industry job classification . . . adequately explains and justifies Congress's decision to allow the Secretary to adopt the fruits of private efforts as governmental standards"); cf. Royal Ins. Co. v. Ru-Val Elec. Corp., 918 F. Supp. 647, 654 (E.D.N.Y. 1996) (Weinstein, J.) ("The extensive adoption of privately-developed standards [the National Electrical Code] indicates a reliance on private expertise but cannot be considered actual privatization of the lawmaking function.").  Furthermore, in finding constitutional New York City's Rent Stabilization Law of 1969, which afforded an administrative role to a Real Estate Industry Stabilization Association comprised of private dwelling owners, the New York Court of Appeals noted that "fair latitude should be allowed by the court to the legislative body to generate new and imaginative mechanisms addressed to municipal problems." 8200 Realty Corp. v. Lindsay, 261 N.E.2d 647, 651 (N.Y. 1970).  The court found that because the City's delegation was "closely circumscribed," "no one could seriously entertain a fear that government has yielded any real sovereign power." Id.

The Bat Ordinance's reliance on MLB's official rules is just the sort of incorporation by reference of a private body's

standards that raises no concern about a delegation of
legislative responsibility or abdication of sovereign authority.
The ordinance does not delegate to MLB the responsibility to
establish regulations for the City; rather, it adopts a very
limited existing set of standards to a specific type of product
that the City has determined to regulate in specific situations.
The Bat Ordinance does not rely solely on MLB's guidance, because
it limits bats allowed under the MLB rules by further requiring
that they be wood laminated or wood composite and that they
contain no metal.  Moreover, the City retains the authority to
modify or repeal its ordinance, and therefore it has not
delegated the MLB the power to set municipal law.  See Royal
Ins., 918 F. Supp. at 654.  The Bat Ordinance differs from the
enactments at issue in several cases on which the plaintiffs rely
that have delegated broad discretion or decisionmaking authority
to a private entity.  Cf. Fink v. Cole, 97 N.E.2d 873, 876 (N.Y.
1951) (finding statute delegating power to license horse owners,
trainers, and jockeys to run races to a private club
unconstitutional under the New York Constitution); Builders'
Council of Suburban New York, Inc. v. City of Yonkers, 434
N.Y.S.2d 566, 567 (Sup. Ct. 1979) (finding ordinance empowering
private actors to carry out inspections of dwellings to be an
"abdication of legislative power to a private party").  Nor does
the Bat Ordinance's incorporation by reference of MLB's

regulations raise the kind of concerns about anticompetition or collusion at issue in Atlantic-Inland, Inc. v. Union, 483 N.Y.S.2d 612, 615 (Sup. Ct. 1984), and Gen. Elec., 936 F.2d at 1456-59.

The plaintiffs also contend that the Bat Ordinance's reliance on MLB's regulations is problematic because the ordinance would presumably incorporate any changes MLB makes to its official rules. Any changes would be proscribed, of course, by the language of the Bat Ordinance which limits the application of MLB's regulations (1) to wood laminated or wood composite bats, and (2) to bats not containing metal. There is no indication that MLB has made any dramatic change in its official rules with respect to allowable bats, and the suggestion that such a change could affect the Bat Ordinance's constitutionality is therefore hypothetical, speculative, and not ripe for decision at this time. The legislative adoption of MLB rules to a limited set of circumstances is consistent with the cases that have approved the incorporation of privately developed standards.

For these reasons, the City has shown as a matter of law that the Bat Ordinance does not constitute an unconstitutional delegation of legislative power.

## C.

The plaintiffs also argue that the Bat Ordinance violates the dormant Commerce Clause because they allege its burden on interstate commerce will outweigh its local benefit.

"A statute may violate the well-established 'dormant' aspect of the Commerce Clause in one of two ways:  it may clearly discriminate against interstate commerce, in which case it is virtually invalid per se, or even if it does not evince such discriminatory effect, it may still be unconstitutional if it imposes a burden on interstate commerce incommensurate with the local benefits secured."  Nat'l Elec. Mfrs. Assoc. v. Sorrell, 272 F.3d 104, 108 (2d Cir. 2001) (citations omitted); see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 127 S. Ct. 1786, 1793, 1797 (2007).  The parties agree that only the second manner is implicated because the Bat Ordinance does not clearly discriminate against interstate commerce.  The balancing test applied in the absence of a clearly discriminatory effect was stated as follows by the Supreme Court in Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970) (citation omitted):

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.  If a legitimate local purpose is found, then the question becomes one of degree.  And the extent of

32

the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

To invoke the Pike test at all, however, it is necessary to determine whether any "incidental" burden on interstate commerce is alleged.  In other words, the plaintiffs must show that the ordinance imposes a "burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." Sorrell, 272 F.3d at 109.

As part of this showing, the plaintiffs must show that the ordinance has some effect on interstate commerce.  While their papers are not altogether clear on the point, it appears that the plaintiffs contend the Bat Ordinance will affect the interstate commerce associated with travel by New York City teams that wish to play games against teams outside the state, and by out-of-state teams who wish to play games in the City.  In particular, the plaintiffs allege that New York City teams playing interstate games will have to decide whether to purchase additional metal or composite bats not permitted under the Bat Ordinance but popular in other locations, which will impose additional costs, or to forego those costs and play at a competitive disadvantage with wood bats.  Similarly, the ordinance's prohibition of metal and certain composite bats may deter out-of-state teams that wish to play in New York.  The plaintiffs assert that these effects will

likely cause many teams to cancel their interstate games, and may consequently reduce the exposure of New York City high school players to certain scouts that attend competitive interstate games.

These allegations of an impact on the number of interstate games played and on the interstate travel of players and coaches who would play those games, while breathtakingly speculative, raise at least a possibility of impact on interstate commerce within the meaning of the Commerce Clause.  See Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 573 (1997) (finding that a not-for-profit camp that attracted primarily out-of-state campers involved interstate commerce); see also Edwards v. California, 314 U.S. 160, 166 (1941) ("[I]it is settled beyond question that the transportation of persons is 'commerce,' within the meaning of [the Commerce Clause].").

However, even accepting the plaintiffs' speculation about a reduction in interstate games played, these effects do not constitute a "burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce."  The Court of Appeals for the Second Circuit noted that it has recognized three circumstances where an "evenhanded" regulation meets this test for an "incidental burden":

> (1) when the regulation has a disparate impact on any
> non-local commercial activity; (2) when the statute
> regulates commercial activity that takes place wholly

> beyond the state's borders; and (3) when the challenged
> statute imposes a regulatory requirement inconsistent
> with those of other states.

Town of Southold v. Town of East Hampton, 477 F.3d 38, 50 (2d

Cir. 2007) (quoting United Haulers Ass'n v. Oneida-Herkimer Solid

Waste Mgmt. Auth., 438 F.3d 150, 156-57 (2d Cir. 2006) aff'd, 127

S. Ct. 1786).  Of these circumstances, the plaintiffs only argue

that the third applies.

None of these circumstances exists in this case.  Even if

the Bat Ordinance reduces the number of interstate games played

by City teams, there is no evidence to suggest that the impact in

other locales will be greater than in the City.  The second

circumstance plainly does not apply because the ordinance limits

its applicability to games played within the City.  Finally, the

ordinance cannot be considered inconsistent with regulations in

neighboring states because there is no evidence that any has

enacted an incompatible regulation, or in fact any regulation

relating to baseball bats.  See Sorrell, 272 F.3d at 112 ("It is

not enough to point to a risk of conflicting regulatory regimes

in multiple states; there must be an actual conflict between the

challenged regulation and those in place in other states.").  No

regulation prevents New York City high school players from

playing with any type of bats outside New York City, and there is

no regulation outside New York City that is inconsistent with the

Bat Ordinance in New York City.  The Court therefore concludes

that the plaintiffs have failed to show a cognizable "incidental burden" sufficient to implicate the Pike test.

Because the Court of Appeals has expressed reluctance to find the above list of circumstances exhaustive, however, it is appropriate to conduct an alternative analysis under the Pike test, assuming the hypothesized reduction in interstate games engenders some differential burden. See United Haulers, 438 F.3d at 157-160 (noting that "we have never held that the above list of recognized differential burdens is a closed set" and proceeding to apply the Pike balancing test assuming a differential burden existed).[5]  The first step is to assess the weight of the burden imposed on interstate commerce.

In its reply, the City submitted a Reply Declaration by its counsel asserting that the number of games New York City high school baseball teams play against out-of-state opponents is "de minimis." (Horowitz Reply Decl. ¶ 4.)  The conclusion was based on data in an attached table obtained through internet searches, from which counsel estimates that out-of-state games constituted 1.25% of all games played by City high school in the spring of 2007. (Id. ¶ 4 n.1 & Ex. 30.)  The plaintiffs filed a motion to strike this Reply Declaration, attaching their own declaration asserting that the City's data are inaccurate and based on

---

[5]  It bears mention that in United Haulers, unlike this case, the plaintiffs asserted novel grounds for considering the ordinances at issue to be burdens on interstate commerce, one of which the court declined to dismiss.  See 438 F.3d at 157-60.

incorrect assumptions and pointing out specific schools whose
out-of-state games were not tabulated.  (Second Canale Decl.
¶¶ 2-8.)  The plaintiffs object to the Reply Declaration as
hearsay offered without personal knowledge.  The City responds
that the contents of the websites it consulted could be reduced
to admissible form at trial or admitted under the residual
hearsay exception.  The City also notes that the plaintiffs did
not provide a better estimate of the number of out-of-state games
and that the plaintiffs' only evidence on the subject in the
record consists of a declaration stating that New York City teams
play "[d]ozens" of games against out-of-state teams.  (See Canale
Decl. ¶ 13.)

There appears to be no question, even accepting the
plaintiffs' general assertion, that out-of-state games constitute
a very small minority of the games played by City high school
teams, even if the City's estimate is low.[6]  The plaintiffs assert
that it will be expensive for teams to acquire the bats necessary
both to comply with the Bat Ordinance and to compete out of
state, but the record with respect to the additional costs that
will be imposed is noticeably thin.  It is even less clear that
teams who value interstate play will forego out-of-state games
for want of a set of additional bats.  In any event, there is no
showing that the cancellation of some out-of-state games that

---

[6]  The motion to strike (Docket No. 28) is **denied as moot**.

comprise a relatively small portion of the schedule for New York
City teams and those they play is likely to have a significant
effect on interstate commerce.

On the other hand, the "putative local benefit" is weighty.
The Bat Ordinance's legislative purpose to protect the public
health and safety is plainly a legitimate purpose, and one within
the traditional purview of municipal and state government.  The
protection of the health and safety of high school age students
is entitled to great weight.  While the record does not include
clear empirical evidence showing that more serious injuries would
occur without the ordinance, it is the City's legislative
assessment that the risk is too great.  In light of the minimal
burden on interstate commerce that would result even taking the
plaintiffs' rank speculation as true, no rational jury could find
that the burden imposed was "clearly excessive" relative to the
local benefit.  See United Haulers, 127 S. Ct. at 1798 (affirming
grant of summary judgment where burden of county flow control
ordinance on interstate commerce, if any existed, could not
exceed the public benefits); cf. Minnesota v. Clover Leaf
Creamery Co., 449 U.S. 456, 473 (1981) (concluding burden on
interstate commerce from statute banning the sale of milk in
plastic, nonreusable containers was not "clearly excessive" in
light of substantial state interests).

## IV.

Finally, the plaintiffs also move for a preliminary injunction in advance of the Bat Ordinance's September 1, 2007 effective date.  Because the Court has already determined that each of the plaintiffs' claims fail as a matter of law, the Complaint is dismissed and the motion for a preliminary injunction is **denied as moot**.

## CONCLUSION

The Court has considered the plaintiffs' remaining arguments and found them to be either moot or without merit.  The defendant's cross-motion for summary judgment is **granted**.  The plaintiffs' motion for summary judgment is **denied**.  The plaintiffs' motion for a preliminary injunction is **denied as moot**.  The Clerk is directed to enter judgment and to close the case.

**SO ORDERED.**

**Dated:**    **New York, New York**
          **August 27, 2007**

John G. Koeltl
United States District Judge

39